## HOOVER ET AL. *v.* RONWIN ET AL.

No. 82–1474.   Argued January 16, 1984—Decided May 14, 1984

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN and MARSHALL, JJ., joined. STEVENS, J., filed a dissenting opinion, in which WHITE and BLACKMUN, JJ., joined, *post*, p. 582. REHNQUIST, J., took no part in the decision of the case. O'CONNOR, J., took no part in the consideration or decision of the case.

*Charles R. Hoover, pro se*, argued the cause for petitioners. With him on the briefs were *Jefferson L. Lankford* and *Donn G. Kessler*. *Philip E. von Ammon* filed a brief for the State

Bar of Arizona et al. as respondents under this Court's Rule 19.6, in support of petitioners.

Respondent *Edward Ronwin* argued the cause and filed a brief *pro se*.

*Acting Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Assistant Attorney General Baxter, John H. Garvey, Barry Grossman* and *Nancy C. Garrison.**

JUSTICE POWELL delivered the opinion of the Court.

This case presents the question whether the state-action doctrine of immunity from actions under the Sherman Act applies to the grading of bar examinations by the Committee appointed by, and according to the Rules of, the Arizona Supreme Court.

I

Respondent Ronwin was an unsuccessful candidate for admission to the Bar of Arizona in 1974. Petitioners were four members of the Arizona Supreme Court's Committee on Examinations and Admissions (Committee).[1] The Arizona

---

*Briefs of *amici curiae* urging reversal were filed for the National Conference of Bar Examiners by *Kurt W. Melchior, Allan Ashman*, and *Jan T. Chilton;* and for the State Bar of California by *Henry C. Thumann, Herbert M. Rosenthal, Truitt A. Richey, Jr.*, and *Robert M. Sweet.*

A brief of *amici curiae* was filed for the State of Colorado et al. by *Stephen H. Sachs,* Attorney General of Maryland, *Charles O. Monk II* and *Linda H. Jones*, Assistant Attorneys General, *Duane Woodard*, Attorney General of Colorado, *Thomas P. McMahon*, First Assistant Attorney General, *Thomas J. Miller*, Attorney General of Iowa, *John R. Perkins*, Assistant Attorney General, *Robert Abrams*, Attorney General of New York, *Lloyd Constantine*, Assistant Attorney General, *William M. Leech, Jr.*, Attorney General of Tennessee, *William J. Haynes, Jr.*, Deputy Attorney General, *Jim Mattox*, Attorney General of Texas, *David R. Richards*, Executive Assistant Attorney General, *Bronson C. La Follette*, Attorney General of Wisconsin, and *Michael L. Zaleski*, Assistant Attorney General.

[1] Although petitioners represent only four of the seven members of the Committee at the time of the February 1974 bar examination, Ronwin named all seven members in his original complaint. Apparently, three of

Constitution vests authority in the court to determine who should be admitted to practice law in the State. *Hunt* v. *Maricopa County Employees Merit System Comm'n,* 127 Ariz. 259, 261–262, 619 P. 2d 1036, 1038–1039 (1980); see also Ariz. Rev. Stat. Ann. § 32–275 (1976). Pursuant to that authority, the Arizona Supreme Court established the Committee to examine and recommend applicants for admission to the Arizona Bar.[2] The Arizona Supreme Court Rules, adopted by the court and in effect in 1974,[3] delegated certain responsibilities to the Committee while reserving to the court the ultimate authority to grant or deny admission. The

the original defendants to this action did not join, for reasons not apparent, the petition for certiorari in this Court. There is no claim that these members of the Committee failed to participate in or dissented from the actions of the Committee.

[2] The procedure in Arizona is not unique to that State. In recent years, the burgeoning number of candidates for admission to practice law and the increased complexity of the subjects that must be tested have combined to make grading and administration of bar examinations a burdensome task. As a result, although the highest court in each State retains ultimate authority for granting or denying admission to the bar, each of those courts has delegated to a subordinate committee responsibility for preparing, grading, and administering the examination. See F. Klein, S. Leleiko, & J. Mavity, Bar Admission Rules and Student Practice Rules 30–33 (1978).

[3] The parties disagree on the wording of the Rules at the time Ronwin took the bar examination. The disagreement centers around the effective date of some amendments promulgated in 1974. Petitioners contend that the amendments took effect before Ronwin took the February 1974 bar examination; Ronwin submits that they became effective in March 1974. Ronwin concedes that the Supreme Court order amending the Rules provided that the amendments would become effective in January 1974. Notwithstanding this directive, he argues that Ariz. Rev. Stat. Ann. § 12–109 (1982) provided that amendments to the Supreme Court's Rules may not become effective until 60 days after publication and distribution. Since the Supreme Court released the amendments on January 11, Ronwin submits that the earliest possible effective date was March 12.

Ronwin has misread § 12–109. That section only applied to Rules that regulated pleading, practice, and procedure in judicial proceedings in state courts. By its terms, the statute did not limit the jurisdiction of the Arizona Supreme Court to establish the terms of admission to practice law in the State. See Ariz. Rev. Stat. Ann. § 32–275 (1976).

Rules provided that the Committee "shall examine applicants" on subjects enumerated in the Rules and "recommend to th[e] court for admission to practice" applicants found to have the requisite qualifications. Rule 28(a) (1973).[4] They also authorized the Committee to "utilize such grading or scoring system as the Committee deems appropriate in its discretion,"[5] and to use the Multi-State Bar Examination. Rule 28(c) VII A (1973), as amended, 110 Ariz. xxvii, xxxii (1974). Even with respect to "grading or scoring," the court did not delegate final authority to the Committee. The Rules directed the Committee to file the formula it intended to use in grading the examination with the court 30 days prior to giving the examination.[6] Also, after grading the examination and compiling the list of those applicants whom it con-

---

[4] Rule 28(a) provided:

"Examination and Admission. . . . The examination and admission of applicants for membership in the State Bar of Arizona shall conform to this Rule. For such purpose, a committee on examinations and admissions consisting of seven active members of the state bar shall be appointed by this court. . . . The committee shall examine applicants and recommend to this court for admission to practice applicants who are found by the committee to have the necessary qualifications and to fulfill the requirements prescribed by the rules of the board of governors as approved by this court respecting examinations and admissions. . . . The court will then consider the recommendations and either grant or deny admission."

[5] According to Ronwin's complaint, the Committee announced before the February examination that the passing grade on the test would be 70, but it assigned grades using a scaled scoring system. Under this system, the examinations were graded first without reference to any grading scale. Thus, each examination was assigned a "raw score" based on the number of correct answers. The Committee then converted the raw score into a score on a scale of zero to 100 by establishing the raw score that would be deemed the equivalent of "seventy." See n. 19, *infra.*

[6] Rule 28(c) VII B provided:

"The Committee on Examinations and Admissions will file with the Supreme Court thirty (30) days before each examination the formula upon which the Multi-State Bar Examination results will be applied with the other portions of the total examination results. In addition the Committee will file with the Court thirty (30) days before each examination the proposed formula for grading the entire examination." 110 Ariz., at xxxii.

sidered qualified to practice law in the State, the Committee was directed to submit its recommendations to the court for final action. Rule 28(a). Under the Rules and Arizona case law, only the court had authority to admit or deny admission.[7] Finally, a rejected applicant was entitled to seek individualized review of an adverse recommendation of the Committee by filing a petition directly with the court.[8] The

---

[7] See n. 4, *supra; Application of Courtney*, 83 Ariz. 231, 233, 319 P. 2d 991, 993 (1957) ("[T]his court may in the exercise of its inherent powers, admit to the practice of law with or without favorable action by the Committee"); *Hackin* v. *Lockwood*, 361 F. 2d 499, 501 (CA9) ("[W]e find the power to grant or deny admission is vested solely in the Arizona Supreme Court"), cert. denied, 385 U. S. 960 (1966). See also *Application of Burke*, 87 Ariz. 336, 351 P. 2d 169 (1960).

[8] Rule 28(c) XII F provided:
"1. An applicant aggrieved by any decision of the Committee
   "(A) Refusing permission to take an examination upon the record;
   "(B) Refusing permission to take an examination after hearing;
   "(C) For any substantial cause other than with respect to a claimed failure to award a satisfactory grade upon an examination;
"may within 20 days after such occurrence file a verified petition with this Court for a review. . . .
"2. A copy of said petition shall be promptly served upon the chairman or some member of the Committee and the Committee shall within 15 days of such service transmit said applicant's file and a response to the petition fully advising this Court as to the Committee's reasons for its decision and admitting or contesting any assertions made by applicant in said petition. Thereupon this Court shall consider the papers so filed together with the petition and response and make such order, hold such hearings and give such directions as it may in its discretion deem best adapted to a prompt and fair decision as to the rights and obligations of applicant judged in the light of the Committee's and this Court's obligation to the public to see that only qualified applicants are admitted to practice as attorneys at law." 110 Ariz., at xxxv–xxxvi.
   Under Rule 28(c) XII G, an applicant who wished to challenge the grading of an answer to a particular question first had to submit his claim to the Committee for review. The applicant was entitled to request Arizona Supreme Court review only if three members of the Committee agreed with the applicant that his answer had not received the grade it deserved. The Rule also provided that the court could grant or deny such a request in its discretion. *Id.*, at xxxvi–xxxvii.

Rules required the Committee to file a response to such a petition and called for a prompt and fair decision on the applicant's claims by the Arizona Supreme Court.

Ronwin took the Arizona bar examination in February 1974.[9] He failed to pass, the Committee recommended to the Arizona Supreme Court that it deny him admission to the Bar, and the court accepted the recommendation. Ronwin petitioned the court to review the manner in which the Committee conducted and graded the examination. In particular, he alleged that the Committee had failed to provide him with model answers to the examination, had failed to file its grading formula with the court within the time period specified in the Rules, had applied a "draconian" pass-fail process, had used a grading formula that measured group, rather than individual, performance, had failed to test applicants on an area of the law on which the Rules required testing, and had conducted the examination in a "pressure-cooker atmosphere." He further alleged that the Committee's conduct constituted an abuse of discretion, deprived him of due process and equal protection, and violated the Sherman Act.[10] The court denied his petition and two subsequent petitions for rehearing.[11] Ronwin then sought review of the Arizona

---

[9] The Arizona Supreme Court Rules instructed the Committee to give two examinations each year—one in July and one in February. *Id.*, at xxxii.

[10] He also alleged that the Committee had violated his constitutional rights by refusing, after the grades had been released, to provide him with the questions and answers to the Multi-State portion of the examination.

[11] Rule 28(c) XII F 2 provides, with respect to the petition of an aggrieved applicant, that the Arizona Supreme Court "shall consider" the petition and response, and "hold such hearings and give such directions as it may in its discretion deem best adapted to a prompt and fair decision." 110 Ariz., at xxxvi. Ronwin makes no claim that the court failed to comply with its Rules, although—of course—he disagrees with the court's judgment denying his petition. Thus, the court's denial of his petition must be construed as a consideration and rejection of the arguments made in the petition—including Ronwin's claim that the Sherman Act was violated.

Supreme Court's action in this Court. We denied his petition for certiorari. 419 U. S. 967 (1974).

Some four years later, in March 1978, Ronwin filed this action in the United States District Court for the District of Arizona. Petitioners were named as defendants in the suit in their capacity as individual members of the Committee.[12] Ronwin renewed his complaint that petitioners had conspired to restrain trade in violation of § 1 of the Sherman Act, 26 Stat. 209, 15 U. S. C. § 1, by "artificially reducing the numbers of competing attorneys in the State of Arizona."[13] The gist of Ronwin's argument is that the Committee of which petitioners constituted a majority had set the grading scale on the February examination with reference to the number of new attorneys they thought desirable, rather than with reference to some "suitable" level of competence. Petitioners moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which

---

[12] Also named as defendants were petitioners' spouses and the Arizona State Bar. The District Court dismissed the suit as to these defendants and the Court of Appeals affirmed the dismissal. *Ronwin v. State Bar of Arizona*, 686 F. 2d 692, 694, n. 1 (CA9 1981). Ronwin challenged this aspect of the Court of Appeals' opinion in a conditional cross-petition for certiorari. We denied the cross-petition. *Ronwin v. Hoover*, 461 U. S. 938 (1983).

[13] The averment of a Sherman Act violation in Ronwin's complaint is as follows:

"The aforesaid conduct [the "scoring system or formula," see n. 4, *supra*], which the Defendants entered into as a conspiracy or combination, was intended to and did result in a restraint of trade and commerce among the Several States by artificially reducing the numbers of competing attorneys in the State of Arizona; and, in further consequence of said conduct, Plaintiff was among those artificially prevented from entering into competition as an attorney in the State of Arizona and thereby further deprived of the right to compete as an attorney for the legal business deriving from or involving the Several States of the United States, including Arizona." App. 10–11.

The adequacy of these conclusory averments of *intent* is far from certain. The Court of Appeals, however, found the complaint sufficient. Accordingly, we address the "state action" issue.

relief could be granted, and under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction. In particular, petitioners alleged that, acting as a Committee, they were immune from antitrust liability under *Parker* v. *Brown*, 317 U. S. 341 (1943). Petitioners also argued that Ronwin suffered no damage from the conduct of which he complained and that the Committee's conduct had not affected interstate commerce. The District Court granted petitioners' motion after finding that the complaint failed to state a justiciable claim, that the court had no jurisdiction, and that Ronwin lacked standing.[14]

The Court of Appeals for the Ninth Circuit reversed the dismissal of the complaint. *Ronwin* v. *State Bar of Arizona*, 686 F. 2d 692 (1982). The Court of Appeals read the District Court's ruling that Ronwin had failed to state a claim as a holding that bar examination grading procedures are immune from federal antitrust laws under *Parker* v. *Brown*. It reasoned that, although petitioners ultimately might be able to show that they are entitled to state-action immunity, the District Court should not have decided this issue on a Rule 12(b)(6) motion. See 686 F. 2d, at 698. The court stated that under *Parker* and its progeny, the mere fact that petitioners were state officials appointed by the Arizona Supreme Court was insufficient to confer state-action immunity on them. 686 F. 2d, at 697. Relying on its reading of several recent opinions of this Court,[15] the Court of Appeals noted that the petitioners might be able to invoke the state-

---

[14] The District Court also denied Ronwin's motion requesting the trial judge to recuse himself. The Court of Appeals held that the District Court had not abused its discretion in denying the motion. 686 F. 2d., at 701. We declined to review that finding. *Ronwin* v. *Hoover, supra.*

[15] *Community Communications Co.* v. *Boulder,* 455 U. S. 40 (1982); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.,* 445 U. S. 97 (1980); *New Motor Vehicle Board of California* v. *Orrin W. Fox Co.,* 439 U. S. 96 (1978); *Lafayette* v. *Louisiana Power & Light Co.,* 435 U. S. 389 (1978).

action doctrine, but reasoned that they first must show that they were acting pursuant to a "clearly articulated and affirmatively expressed . . . state policy." *Id.*, at 696. Therefore, dismissal for failure to state a claim was improper. The court also held that Ronwin had standing to bring this action. The case was remanded to the District Court for further action.[16]

We granted certiorari to review the Court of Appeals' application of the state-action doctrine. 461 U. S. 926 (1983). We now reverse.

## II

The starting point in any analysis involving the state-action doctrine is the reasoning of *Parker* v. *Brown*. In *Parker*, the Court considered the antitrust implications of the California Agriculture Prorate Act—a state statute that restricted competition among food producers in California. Relying on principles of federalism and state sovereignty, the Court declined to construe the Sherman Act as prohibiting the anticompetitive actions of a State acting through its legislature:

> "We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." 317 U. S., at 350–351.

Thus, under the Court's rationale in *Parker*, when a state legislature adopts legislation, its actions constitute those of

---

[16] The Court of Appeals also held that the District Court should give Ronwin the opportunity to show that petitioners' actions sufficiently affected interstate commerce to fall within the jurisdiction of the Sherman Act. Petitioners did not seek review of this holding.

the State, see *id.*, at 351, and *ipso facto* are exempt from the operation of the antitrust laws.

In the years since the decision in *Parker*, the Court has had occasion in several cases to determine the scope of the state-action doctrine. It has never departed, however, from *Parker*'s basic reasoning. Applying the *Parker* doctrine in *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 360 (1977), the Court held that a state supreme court, when acting in a legislative capacity, occupies the same position as that of a state legislature. Therefore, a decision of a state supreme court, acting legislatively rather than judicially, is exempt from Sherman Act liability as state action. See also *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 790 (1975). Closer analysis is required when the activity at issue is not directly that of the legislature or supreme court,[17] but is carried out by others pursuant to state authorization. See, *e. g.*, *Community Communications Co.* v. *Boulder*, 455 U. S. 40 (1982) (municipal regulation of cable television industry); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980) (private price-fixing arrangement authorized by State); *New Motor Vehicle Board of California* v. *Orrin W. Fox Co.*, 439 U. S. 96 (1978) (new franchises controlled by state administrative board). In such cases, it becomes important to ensure that the anticompetitive conduct of the State's representative was contemplated by the State. *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 413–415 (1978) (opinion of BRENNAN, J.); see *New Mexico* v. *American Petrofina, Inc.*, 501 F. 2d 363, 369–370 (CA9 1974). If the replacing of entirely free competition with some form of regulation or restraint was not authorized or approved by the State then the rationale of *Parker* is inapposite. As a result, in cases

---

[17] This case does not present the issue whether the Governor of a State stands in the same position as the state legislature and supreme court for purposes of the state-action doctrine.

involving the anticompetitive conduct of a nonsovereign state representative the Court has required a showing that the conduct is pursuant to a "clearly articulated and affirmatively expressed state policy" to replace competition with regulation. *Boulder, supra*, at 54. The Court also has found the degree to which the state legislature or supreme court supervises its representative to be relevant to the inquiry. See *Midcal Aluminum, supra*, at 105; *Goldfarb, supra*, at 791. When the conduct is that of the sovereign itself, on the other hand, the danger of unauthorized restraint of trade does not arise. Where the conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of "clear articulation" and "active supervision."

Pursuant to the State Constitution, the Arizona Supreme Court has plenary authority to determine admissions to the Bar.[18] Therefore, the first critical step in our analysis must be to determine whether the conduct challenged here is that of the court. If so, the *Parker* doctrine applies and Ronwin has no cause of action under the Sherman Act.

### III

At issue here is the Arizona plan of determining admissions to the bar, and petitioners' use thereunder of a grading formula. Ronwin has alleged that petitioners conspired to use

---

[18] Ronwin does not dispute that regulation of the bar is a sovereign function of the Arizona Supreme Court. In *Bates* v. *State Bar of Arizona*, 433 U. S. 350, 361 (1977), the Court noted that "the regulation of the activities of the bar is at the core of the State's power to protect the public." Likewise, in *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773, 792 (1975), the Court stated: "The interest of the States in regulating lawyers is especially great since lawyers are essential to the primary governmental function of administering justice, and have historically been 'officers of the courts.'" See also *In re Griffiths*, 413 U. S. 717, 722–723 (1973). Few other professions are as close to "the core of the State's power to protect the public." Nor is any trade or other profession as "essential to the primary governmental function of administering justice."

that formula to restrain competition among lawyers.[19]   His argument is that, although petitioners qualified as state officials in their capacity as members of the Committee, they acted independently of the Arizona Supreme Court.   As a result, the argument continues, the Committee's actions are those of a Supreme Court representative, rather than those of the court itself, and therefore are not entitled to immunity.

We cannot agree that the actions of the Committee can be divorced from the Supreme Court's exercise of its sovereign powers.   The Court's opinion in *Bates* v. *State Bar of Arizona*, 433 U. S., at 360, is directly pertinent.[20]   In *Bates*, two

[19] Ronwin's complaint, see *supra*, at 565, focuses on the grading formula as the means used to "restrain competition."   He describes it as follows: "The Defendants did not grade on a Zero to One Hundred (0 to 100) scale; rather they used a "raw score" system.   After the raw scores were known, the Defendants picked a particular raw score value as equal to the passing grade of Seventy (70).   Thereby the number of Bar applicants who would receive a passing grade depended upon the exact raw score value chosen as equal to Seventy (70); rather than achievement by each Bar applicant of a pre-set standard."   App. 10.

Apparently Ronwin was trying to describe a "procedure commonly known as test standardization" or "scaled scoring."   See Brief for State Bar of California as *Amicus Curiae* 7.   This method of scoring, viewed as the fairest by the Educational Testing Service (ETS) for the Multistate Bar Examination (MBE), see S. Duhl, The Bar Examiners' Handbook 61–62 (2d ed. 1980), published by The National Conference of Bar Examiners, is described as follows:

"In addition to the 'raw' scores (number of correct answers), ETS reports a 'scaled' score for each applicant.   In a series of tests, such as the MBE, which are intended to measure levels of competence, it is important to have a standardized score which represents the same level of competence from test to test.   The raw score is not dependable for this purpose since the level of difficulty varies from test to test.   It is not possible to draft two tests of exactly the same level of difficulty.   Scaled scores are obtained by reusing some questions from earlier tests which have been standardized. A statistical analysis of the scores on the reused questions determines how many points are to be added to or subtracted from the raw score to provide an applicant's scaled score.   Thus a particular scaled score represents the same level of competence from examination to examination."

[20] Although the Court of Appeals recognized the similarity between this case and *Bates*, it found the facts in *Goldfarb* v. *Virginia State Bar*, *supra*,

attorneys were suspended temporarily from the practice of law in Arizona for violating a disciplinary rule of the American Bar Association (ABA) that prohibited most lawyer advertising. The Arizona Supreme Court had incorporated the ABA's advertising prohibition into the local Supreme Court Rules.[21] Those Rules also provided that the Board of Governors of the Arizona State Bar Association, acting on the recommendation of a local Bar disciplinary committee, could recommend the censure or suspension of a member of the Bar for violating the advertising ban. Under the Rules, the Board of Governor's recommendation automatically would become effective if the aggrieved party did not object to the recommendation within 10 days. If the party objected, he was entitled to have the Arizona Supreme Court review the findings and recommendations of the Board of Governors and the local committee. The plaintiffs challenged the Rule on Sherman Act and First Amendment grounds. This Court ultimately concluded that the ABA Rule violated the First Amendment, but it first held that the State Bar Association was immune from Sherman Act liability because its enforcement of the disciplinary Rules was state action. In reaching this conclusion, the Court noted that, although only the State Bar was named as a defendant in the suit, the suspended attorneys' complaint was with the State. The Court stated:

> "[T]he appellants' claims are against the State. The Arizona Supreme Court is the real party in interest; it adopted the rules, and it is the ultimate trier of fact and law in the enforcement process. *In re Wilson*, 106

---

to be more analogous. The court's reliance on *Goldfarb* was misplaced. As the dissent of Judge Ferguson noted, *Goldfarb* involved procedures that were not approved by the State Supreme Court or the state legislature. In contrast, petitioners here performed functions required by the Supreme Court Rules and that are not effective unless approved by the court itself.

[21] Rule 29(a) of the Supreme Court of Arizona provided: "The duties and obligations of members [of the Bar] shall be as prescribed by the Code of Professional Responsibility of the American Bar Association. . . ."

Ariz. 34, 470 P. 2d 441 (1970). Although the State Bar plays a part in the enforcement of the rules, its role is completely defined by the court; the [State Bar] acts as the agent of the court under its continuous supervision." *Id.*, at 361.

The opinion and holding in *Bates* with respect to the state-action doctrine were unanimous.

The logic of the Court's holding in *Bates* applies with greater force to the Committee and its actions. The petitioners here were each members of an official body selected and appointed by the Arizona Supreme Court. Indeed, it is conceded that they were state officers. The court gave the members of the Committee discretion in compiling and grading the bar examination, but retained strict supervisory powers and ultimate full authority over its actions. The Supreme Court Rules specified the subjects to be tested, and the general qualifications required of applicants for the Bar. With respect to the specific conduct of which Ronwin complained—establishment of an examination grading formula— the Rules were explicit. Rule 28(c) VII A authorized the Committee to determine an appropriate "grading or scoring system" and Rule 28(c) VII B required the Committee to submit its grading formula to the Supreme Court at least 30 days prior to the examination.[22] After giving and grading the examination, the Committee's authority was limited to

---

[22] Following petitioners' request for a rehearing in the Court of Appeals, the parties debated whether and to what extent the Committee complied with this Rule. For purposes of determining the application of the state-action doctrine, it is sufficient that the Rules contained an enforceable provision calling for submission of the grading formula. Moreover, the Rules contained a review procedure that allowed an aggrieved applicant to bring to the Supreme Court's attention any failure of the Committee to comply with the filing requirements in Rule 28(c) VII B. The record reveals that Ronwin, in fact, alleged in his petition for review in the Arizona Supreme Court that the Committee had not filed its grading formula within the time provided in the Rule. The court rejected the petition. See *supra*, at 564.

making recommendations to the Supreme Court. The court itself made the final decision to grant or deny admission to practice. Finally, Rule 28(c) XII F provided for a detailed mandatory review procedure by which an aggrieved candidate could challenge the Committee's grading formula.[23] In light of these provisions and the Court's holding and reasoning in *Bates*, we conclude that, although the Arizona Supreme Court necessarily delegated the administration of the admissions process to the Committee, the court itself approved the particular grading formula and retained the sole authority to determine who should be admitted to the practice of law in Arizona. Thus, the conduct that Ronwin challenges was in reality that of the Arizona Supreme Court. See *Bates*, 433 U. S., at 361. It therefore is exempt from Sherman Act liability under the state-action doctrine of *Parker* v. *Brown*.[24]

---

[23] This procedure allowed a disappointed applicant to challenge "[f]or any substantial cause" a Committee decision other than "a claimed failure to award a satisfactory grade." Rule 28(c) XII F 1(C). As we have noted, Ronwin took full advantage of Rule 28(c) XII F 1(C) in his challenge to the action of the Committee and the court. See *supra*, at 564. He did not, however, challenge the particular grade assigned to any of his answers.

[24] The Solicitor General, on behalf of the United States as *amicus*, contends that our recent opinion in *Community Communications Co.* v. *Boulder*, 455 U. S. 40 (1982), precludes a finding that the Committee's action was attributable to the Arizona Supreme Court. Contrary to the Solicitor General's suggestion, our reasoning in *Boulder* supports the conclusion we reach today. In *Boulder*, we reiterated the analysis of JUSTICE BRENNAN's opinion in *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389 (1978). We noted that the state-action doctrine is grounded in concepts of federalism and state sovereignty. 455 U. S., at 54. We stated that *Parker* did not confer state-action immunity automatically on municipalities, because the actions of a municipality are not those of the State itself. 455 U. S., at 53. Under our holding in *Boulder*, municipalities may be eligible for state-action immunity, but only "to the extent that they ac[t] pursuant to a clearly articulated and affirmatively expressed state policy." *Id.*, at 54; see also *Lafayette*, *supra*, at 411–412 (opinion of BRENNAN, J.). Consistent with our reasoning in *Boulder*, our decision today rests on our conclusion that the conduct Ronwin complains of clearly is the action of the State. *Bates* is explicit authority for this conclusion.

At oral argument, Ronwin suggested that we should not attribute to the Arizona Supreme Court an intent to approve the anticompetitive activity of petitioners in the absence of proof that the court was aware that petitioners had devised a grading formula the purpose of which was to limit the number of lawyers in the State. This argument misconceives the basis of the state-action doctrine. The reason that state action is immune from Sherman Act liability is not that the State has chosen to act in an anticompetitive fashion, but that the State itself has chosen to act. "There is no suggestion of a purpose to restrain state action in the [Sherman] Act's legislative history." *Parker*, 317 U. S., at 351. The Court did not suggest in *Parker*, nor has it suggested since, that a state action is exempt from antitrust liability only if the sovereign acted wisely after full disclosure from its subordinate officers. The only requirement is that the action be that of "the State acting as a sovereign." *Bates*, *supra*, at 360. The action at issue here, whether anticompetitive or not, clearly was that of the Arizona Supreme Court.[25]

## IV

The dissenting opinion of JUSTICE STEVENS would, if it were adopted, alter dramatically the doctrine of state-action immunity. We therefore reply directly. The dissent concedes, as it must, that "the Arizona Supreme Court exercises sovereign power with respect to admission to the Arizona Bar," and "if the challenged conduct were that of the court, it would be immune under *Parker*." *Post*, at 588. It also is con-

---

[25] Our holding that petitioners' conduct is exempt from liability under the Sherman Act precludes the need to address petitioners' contention that they are immune from liability under the *Noerr-Pennington* doctrine. See *Mine Workers* v. *Pennington*, 381 U. S. 657 (1965); *Eastern Railroad Presidents Conference* v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961).

We also do not address Ronwin's contention that the Arizona method of limiting bar admissions violates the Fifth and Fourteenth Amendments. As Ronwin concedes, he made this argument for the first time in his response to petitioners' motion for rehearing in the Court of Appeals. His failure to raise this issue in a timely manner precludes our consideration.

ceded that the members of the court's Commitee on Examinations and Admissions—petitioners here—are state officers. These concessions are compelled by the Court's decision in *Bates*, and we think they dispose of Ronwin's contentions.

In its effort to distinguish *Bates*, the dissent notes that the Arizona Supreme Court "is not a petitioner [in this case], nor was it named as a defendant in respondent's complaint," and "because respondent is not challenging the conduct of the Arizona Supreme Court, *Parker [v. Brown]* is simply inapplicable." *Post*, at 588, 589. The dissent fails to recognize that this is precisely the situation that existed in *Bates*. In that case, the Supreme Court of Arizona was not a party in this Court, nor was it named as a defendant by the complaining lawyers. Yet, in our unanimous opinion, we concluded that the claims by appellants in *Bates* were "against the State," and that the "Arizona Supreme Court [was] the real party in interest; it adopted the rules, and it [was] the ultimate trier of fact and law in the enforcement process." *Bates* v. *State Bar of Arizona, supra*, at 361; see *supra*, at 571.[26]

The core argument of the dissent is that Ronwin has challenged only the action of the Committee and not that of the Arizona Supreme Court. It states that "there is no claim that the *court* directed [the Committee] to artificially reduce the number of lawyers in Arizona," and therefore the Committee cannot assert the sovereign's antitrust immunity. *Post*, at 592 (emphasis in original). The dissent does not acknowledge that, conspire as they might, the Committee could not reduce the *number* of lawyers in Arizona.[27] Only

---

[26] The authority of the Arizona Supreme Court to determine who shall be admitted to the Bar, and by what procedure, is even more clearly defined than the role of that court in *Bates*. In that case, State Bar Committee members were not appointed by the court, and the court did not expressly accept or reject each of the Committee's actions.

[27] Under Arizona law, the responsibility is on the court—and only on it—to admit or deny admission to the practice of law. This Court certainly cannot assume that the Arizona court, in the exercise of its specifically reserved power under its Rules, invariably agrees with its Committee. Even if it did, however, it would be action of the sovereign.

the Arizona Supreme Court had the authority to grant or deny admission to practice in the State.[28]   As in *Bates* "[t]he Arizona Supreme Court is the real party in interest."   433 U. S., at 361.

The dissent largely ignores the Rules of the Arizona Supreme Court.[29]   A summary of the court's commands suggests why the dissent apparently prefers not to address them.   The Arizona Supreme Court established the Committee for the sole purpose of examining and recommending applicants for admission to the Bar.   Rule 28(a).   Its Rules provided: "The examination and admission of applicants . . . *shall* conform to this Rule. . . . The committee *shall* examine applicants and recommend [qualified applicants] to this court. . . . Two examinations *will be* held each year. . . ." *Ibid.;* Rule 28(c) VI (1973), as amended, 110 Ariz. xxxii (1974) (emphasis added).   The Rules also specified the subjects to be tested and required the Committee to submit its grading formula to the court in advance of each examination. Rule 28(c) VII (1973), as amended, 110 Ariz. xxxii (1974).

As a further safeguard, a disappointed applicant was accorded the right to seek individualized review by filing a petition directly with the court—as Ronwin did unsuccessfully.   Pursuant to Rule 28(c) XII F, Ronwin filed a complaint with the court that contained a plethora of charges

---

[28] Even if Committee members had decided to grade more strictly, under the grading formula approved by the court, for the purpose of reducing the total number of lawyers admitted to practice, the court knew and approved the *number* of applicants.   This was the definitive action.   There is nothing in the state-action doctrine, or in antitrust law, that permits us to question the motives for the sovereign action of the court.

[29] The dissent recites the provisions of the Rules regulating the composition and origin of the Committee and notes that the Rules require the Committee to recommend qualified applicants to the Supreme Court. *Post,* at 586.   The dissent does not mention, however, several critical provisions, summarized in the text *infra,* that articulate the Arizona Supreme Court's intent to retain full authority over, and responsibility for, the bar admissions process.

including the substance of the complaint in this case. The court denied his petition as well as two petitions for rehearing. See *supra*, at 564. Thus, again there was *state action* by the court itself explicitly rejecting Ronwin's claim.[30] Finally, the

[30] The dissent states, *post*, at 591–592, n. 15, that we "advanced the theory that *the* relevant 'state action' " was the State Supreme Court's denial of Ronwin's postexamination petitions filed with the court. (Emphasis supplied.) The dissent is inaccurate. Our holding is based on the court's direct participation in every stage of the admissions process, including retention of the sole authority to admit or deny. The critical action in this case was the court's decision to deny Ronwin admission to the Bar. The dissent's suggestion that the Arizona Supreme Court never made this decision simply ignores Arizona law. The Arizona Supreme Court has stated on several occasions that it, and not the Committee, makes the decision to admit or deny admission to applicants. In *Application of Burke*, 87 Ariz., at 338, 351 P. 2d, at 171–172, the court stated:

"[I]t is not the function of the committee to grant or deny admission to the bar. That power rests *solely* in the Supreme Court. . . . The committee's bounden duty is to 'put up the red flag' as to those applicants about whom it has some substantial doubt. If such doubt exists, then its recommendation should be withheld. The applicant may feel that any questions raised as to his character or qualifications are without substance. In such case, he may apply directly to this court for admission. In the final analysis—it *being a judicial function*—we have the *duty* of resolving those questions, one way or the other. . . ." (Emphasis supplied.)

In a similar vein, the court stated in *Application of Levine*, 97 Ariz. 88, 92, 397 P. 2d 205, 207 (1964):

"If the committee fails to recommend the admission of an applicant, he may challenge the committee's conclusions by an original application to this Court . . . . This Court will direct the committee to show cause why the applicant has been refused a favorable recommendation and on the applicant's petition and the committee's response, using our independent judgment, de novo determine whether the necessary qualifications have been shown."

See also *Application of Kiser*, 107 Ariz. 326, 327, 487 P. 2d 393, 394 (1971).

Thus, the Arizona Supreme Court repeatedly has affirmed its responsibility as the final decisionmaker on admissions to the Bar. The dissent, relying on the absence in the record before us of a specific order of the court at the time Ronwin was not admitted, nevertheless would have us hold that the Committee rather than the court made the final decisions as

case law, as well as the Rules, makes clear that the Arizona Supreme Court made the final decision on each applicant.[31] See n. 6, *supra*. Unlike the actions of the Virginia State Bar in *Goldfarb*, the actions of the Committee are governed by the court's Rules. Those Rules carefully reserve to the court the authority to make the decision to admit or deny, and that decision is the critical state action here.[32] See *Bates*, 433

---

to admissions and denials of the applicants who took the examination in February 1974. If the dissent were correct, there would have been *no valid* action with respect to those who took that examination since, under Arizona law, the Committee had no independent power to act. Ronwin's complaint makes no such extreme averment, and certainly this Court will not assume that the Supreme Court of Arizona failed to discharge its responsibility. Moreover, as we have noted, *supra*, at 576–577, Ronwin's claims were specifically rejected by the court.

[31] It is true, of course, that framing examination questions and particularly the grading of the examinations involved the exercise of judgment and discretion by the examiners. This discretion necessarily was delegated to the Arizona Committee, just as it must be unless state supreme courts themselves undertake the grading. By its Rules, the Arizona Supreme Court gave affirmative directions to the Committee with respect to every nondiscretionary function, reserving the ultimate authority to control the number of lawyers admitted to the Arizona Bar. Ronwin avers a "conspiracy to limit the number" of applicants admitted. He makes no claim of animus or discriminatory intent with respect to himself.

Ronwin apparently would have us believe that grading examinations is an exact science that separates the qualified from the unqualified applicants. Ideally, perhaps, this should be true. But law schools and bar examining committees must identify a grade below which students and applicants fail to pass. No setting of a passing grade or adoption of a grading formula can eliminate—except on multiple choice exams—the discretion exercised by the grader. By its very nature, therefore, grading examinations does not necessarily separate the competent from the incompetent or—except very roughly—identify those qualified to practice law and those not qualified. At best, a bar examination can identify those applicants who are *more* qualified to practice law than those less qualified.

[32] JUSTICE STEVENS' dissent states that "[a]ny possible claim that the challenged conduct is that of the State Supreme Court is squarely foreclosed by *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975)." *Post*, at 589. At issue in *Goldfarb* was a Sherman Act challenge to minimum-fee schedules maintained by the Fairfax County Bar Association and enforced

U. S., at 359–361. Our opinion, therefore, also is wholly consistent with the Court's reasoning in *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389 (1978) and *Community Communications Co.* v. *Boulder*, 455 U. S. 40 (1982).[33]

Our holding is derived directly from the reasoning of *Parker* and *Bates*. Those cases unmistakably hold that, where the action complained of—here the failure to admit

---

by the Virginia State Bar. In *Goldfarb*, state law did not refer to lawyers' fees, the Virginia Supreme Court Rules did not direct the State Bar to supply fee schedules, and the Supreme Court did not approve the fee schedules established by the State Bar. To the contrary, the court "directed lawyers not 'to be controlled' by fee schedules." 421 U. S., at 789. Thus, even though the State Bar was a state agency, the Court concluded that "it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent." *Id.*, at 790. As is evident from the provisions in the Arizona Supreme Court Rules, this case arises under totally different circumstances, although the relevant legal principles are the same. The dissent's reliance on *Goldfarb* simply misreads the decision in that case.

[33] The dissent relies on *Boulder*, arguing that the "clearly articulated and affirmatively expressed state policy" does not exist in this case. *Post*, at 594–596. What the dissent overlooks is that the Court in *Boulder* was careful to say that action is not "exempt from antitrust scrutiny unless it constitutes the action of the State of Colorado itself in its sovereign capacity, see *Parker*, or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy, see *City of Lafayette . . . .*" 455 U. S., at 52. Thus, unlike the dissent here, JUSTICE BRENNAN in *Boulder* was careful to distinguish between action by the sovereign itself and action taken by a subordinate body.

The dissent also cites *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579 (1976), and *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97 (1980), as presenting situations analogous to the action of the Arizona Supreme Court. This argument overlooks the fundamental difference between this case and the several cases cited by respondent. In each of those cases, it was necessary for the Court to determine whether there had been a clearly articulated and affirmatively expressed state policy because the challenged conduct was not that of the State "acting as sovereign." Here, as we have noted above, the Arizona Supreme Court, acting in its sovereign capacity, made the final decision to deny admission to Ronwin. See n. 30, *supra*.

Ronwin to the Bar—was that of the State itself, the action is exempt from antitrust liability regardless of the State's motives in taking the action. Application of that standard to the facts of this case requires that we reverse the judgment of the Court of Appeals.

The reasoning adopted by the dissent would allow Sherman Act plaintiffs to look behind the actions of state sovereigns and base their claims on perceived conspiracies to restrain trade among the committees, commissions, or others who necessarily must advise the sovereign. Such a holding would emasculate the *Parker* v. *Brown* doctrine. For example, if a state legislature enacted a law based on studies performed, or advice given, by an advisory committee, the dissent would find the State exempt from Sherman Act liability but not the committee. A party dissatisfied with the new law could circumvent the state-action doctrine by alleging that the committee's advice reflected an undisclosed collective desire to restrain trade without the knowledge of the legislature. The plaintiff certainly would survive a motion to dismiss—or even summary judgment—despite the fact that the suit falls squarely within the class of cases found exempt from Sherman Act liability in *Parker*.[34]

---

[34] The *amicus curiae* brief of the National Conference of Bar Examiners points out that many States have bar admission processes like those at issue in this case. See Brief for National Conference of Bar Examiners as *Amicus Curiae* 1, 2, 8. Typically, the state supreme court is the ultimate decisionmaker and a committee or board conducts the examinations pursuant to court rules. It is customary for lawyers of recognized standing and integrity to serve on these bodies, usually as a public duty and with little or no compensation. See S. Duhl, The Bar Examiner's Handbook 95, 99 (2d ed. 1980). In virtually all States, a significant percentage of those who take the bar examination fail to pass. See 1982 Bar Examination Statistics, 52 Bar Examiner 24–26 (1983). Thus, every year, there are thousands of aspirants who, like Ronwin, are disappointed. For example, in 1974 (the year Ronwin first took the Arizona bar examination), of the 43,798 applicants who took bar examinations nationwide, 10,440 failed to pass. 44 Bar Examiner 115 (1975). The National Conference of Bar Examiners, in its *amicus* brief, cautions that affirmance of the Court of

In summary, this case turns on a narrow and specific issue: who denied Ronwin admission to the Arizona Bar? The dissent argues, in effect, that since there is no court order in the record, the denial must have been the action of the Committee. This argument ignores the incontrovertible fact that under the law of Arizona *only* the State Supreme Court had authority to admit or deny admission to practice law:

> "[It] is not the function of the committee to grant or deny admission to the bar. That power rests solely in the Supreme Court . . . ." *Application of Burke,* 87 Ariz. 336, 338, 351 P. 2d 169, 171 (1960) (see n. 30, *supra*).

Thus, if the dissent's argument were accepted *all* decisions made with respect to admissions and denials of those who took the examination in February 1974 are void. Ronwin did not allege that he alone was a victim: his complaint avers

---

Appeals in this case could well invite numerous suits. It is no answer to say that, of course, such suits are likely to be frivolous. Ronwin, who failed the bar in 1974, has been litigating his claim for a decade on the basis of a complaint that basically challenges the *motive* of the Arizona Committee. His claim is that the grading formula was devised for the purpose of limiting competition. If such an allegation is sufficient to survive a motion to dismiss, examining boards and committees would have to bear the substantial "discovery and litigation burdens" attendant particularly upon refuting a charge of improper motive. See Areeda, Antitrust Immunity for "State Action" after *Lafayette,* 95 Harv. L. Rev. 435, 451 (1981). Moreover, Ronwin has brought a suit for damages under the Sherman Act, with the threat of treble damages. There can be no question that the threat of being sued for damages—particularly where the issue turns on subjective intent or motive—will deter "able citizens" from performing this essential public service. See *Harlow* v. *Fitzgerald,* 457 U. S. 800, 814 (1982). In our view, as the action challenged by Ronwin was that of the State, the motive of the Committee in its recommendations to the court was immaterial. We nevertheless think, particularly in view of the decision below, that the consequences of an affirmance should be understood. The consequences of reversal by the Court today will have only a limited effect. Our attention has not been drawn to any trade or other profession in which the licensing of its members is determined directly by the sovereign itself— here the State Supreme Court.

that he "was among those artificially prevented from entering into competition as an attorney in the state of Arizona " by the Committee's action with respect to the February 1974 examination. We are unwilling to assume that the Arizona Supreme Court failed to comply with state law, and allowed the Committee alone to make the decisions with respect to the February 1974 examination. In any event, the record is explicit that Ronwin's postexamination petition complaining about his denial was rejected by an order of the Arizona Supreme Court. That there was state action at least as to Ronwin could not be clearer.

## V

We conclude that the District Court properly dismissed Ronwin's complaint for failure to state a claim upon which relief can be granted. Therefore, the judgment of the Court of Appeals is

*Reversed.*

JUSTICE REHNQUIST took no part in the decision of this case. JUSTICE O'CONNOR took no part in the consideration or decision of this case.

JUSTICE STEVENS, with whom JUSTICE WHITE and JUSTICE BLACKMUN join, dissenting.

In 14th-century London the bakers' guild regulated the economics of the craft and the quality of its product. In the year 1316, it was adjudged that one Richard de Lughteburghe "should have the punishment of the hurdle" because he sold certain loaves of bread in London; the bread had been baked in Suthwerke, rather than London, and the loaves were not of "the proper weight."[1] Thus Richard had vio-

---

[1] H. Riley, Memorials of London and London Life in the XIIIth, XIVth, and XVth Centuries 119–120 (1868). The punishment is described in a footnote as "[b]eing drawn on a hurdle through the principal streets of the City." *Id.*, at 119, n. 5.

lated a guild restriction designed to protect the economic interests of the local bakers[2] as well as a restriction designed to protect the public from the purchase of inferior products.

For centuries the common law of restraint of trade has been concerned with restrictions on entry into particular professions and occupations. As the case of the Suthwerke baker illustrates, the restrictions imposed by medieval English guilds served two important but quite different purposes. The guilds limited the number of persons who might engage in a particular craft in order to be sure that there was enough work available to enable guild members to earn an adequate livelihood.[3] They also protected the public by ensuring that apprentices, journeymen, and master craftsmen would have the skills that were required for their work. In numerous occupations today, licensing requirements[4] may serve

---

[2] "The principal reason for the existence of the gild was to preserve to its own members the monopoly of trade. No one not in the gild merchant of the town could buy or sell there except under conditions imposed by the gild. Foreigners coming from other countries or traders from other English towns were prohibited from buying or selling in any way that might interfere with the interest of the gildsmen. They must buy and sell at such times and in such places and only such articles as were provided by the gild regulations." E. Cheyney, An Introduction to the Industrial and Social History of England 52–53 (1920).

[3] "The craft gilds existed usually under the authority of the town government, though frequently they obtained authorization or even a charter from the crown. They were formed primarily to regulate and preserve the monopoly of their own occupations in their own town, just as the gild merchant existed to regulate the trade of the town in general. No one could carry on any trade without being subject to the organization which controlled that trade." Id., at 55.

[4] Professor Handler has pointed out:

"Entry into various fields of endeavor is guarded by numerous licensing restrictions. Licenses are demanded of physicians and surgeons, dentists, optometrists, pharmacists and druggists, nurses, midwives, chiropodists, veterinarians, certified public accountants, lawyers, architects, engineers and surveyors, shorthand reporters, master plumbers, undertakers and embalmers, real estate brokers, junk dealers, pawnbrokers, ticket agents, liquor dealers, private detectives, auctioneers, milk dealers, peddlers,

either or both of the broad purposes of the medieval guild restrictions.

The risk that private regulation of market entry, prices, or output may be designed to confer monopoly profits on members of an industry at the expense of the consuming public has been the central concern of both the development of the common law of restraint of trade and our antitrust jurisprudence. At the same time, the risk that the free market may not adequately protect the public from purveyors of inferior goods and services has provided a legitimate justification for the public regulation of entry into a wide variety of occupations. Private regulation is generally proscribed by the antitrust laws; public regulation is generally consistent with antitrust policy. A potential conflict arises, however, whenever government delegates licensing power to private parties whose economic interests may be served by limiting the number of competitors who may engage in a particular trade. In fact private parties have used licensing to advance their own interests in restraining competition at the expense of the public interest. See generally Gellhorn, The Abuse of Occupational Licensing, 44 U. Chi. L. Rev. 6 (1976).

The potential conflict with the antitrust laws may be avoided in either of two ways. The State may itself formulate the governing standards and administer the procedures

---

master pilots and steamship engineers, weighmasters, forest guides, motion picture operators, itinerant retailers on boats, employment agencies, commission merchants of farm produce, and manufacturers of frozen desserts, concentrated feeds, and commercial fertilizers. No factory, cannery, place of public assembly, laundry, cold storage warehouse, shooting gallery, bowling alley and billiard parlor, or place of storage of explosives can be operated nor can industrial house work be carried on without registration or license. Licenses are also required for the sale of minnows, use of fishing nets, and the operation of educational institutions, correspondence schools, filling stations and motor vehicles. Motion pictures cannot be exhibited unless licensed, and canal boats must be registered." M. Handler, Cases and Other Materials on Trade Regulation 3–4 (1937) (footnotes omitted).

that determine whether or not particular applicants are qualified. When the State itself governs entry into a profession, the evils associated with giving power over a market to those who stand to benefit from inhibiting entry into that market are absent. For that reason, state action of that kind, even if it is specifically designed to control output and to regulate prices, does not violate the antitrust laws. *Parker* v. *Brown*, 317 U. S. 341 (1943). Alternatively, the State may delegate to private parties the authority to formulate the standards and to determine the qualifications of particular applicants. When that authority is delegated to those with a stake in the competitive conditions within the market, there is a risk that public power will be exercised for private benefit. To minimize that risk, state policies displacing competition must be "clearly and affirmatively expressed" and must be appropriately supervised. See *Community Communications Co.* v. *Boulder*, 455 U. S. 40 (1982); *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 103–106 (1980).

In this case respondent has been unable to obtain a license to practice law in Arizona. He alleges that this is not because of any doubts about his competence as a lawyer, but because petitioners have engaged in an anticompetitive conspiracy in which they have used the Arizona bar examination to artificially limit the number of persons permitted to practice law in that State. Petitioners claim that the alleged conspiracy is not actionable under § 1 of the Sherman Act, 15 U. S. C. § 1, because it represents the decision of the State. But petitioners do not identify any state body that has decided that it is in the public interest to limit entry of even fully qualified persons into the Arizona Bar. Indeed, the conspiracy that is alleged is not the product of any regulatory scheme at all; there is no evidence that any criterion except competence has been adopted by Arizona as the basis for granting licenses to practice law. The conspiracy respondent has alleged is private; market participants are allegedly

attempting to protect their competitive position through a misuse of their powers.   Yet the Court holds that this conspiracy is cloaked in the State's immunity from the antitrust laws.   In my judgment, the competitive ideal of the Sherman Act may not be so easily escaped.

I

Petitioners are members of the Arizona Supreme Court's Committee on Examinations and Admissions.   The Arizona Supreme Court established the Committee to recommend applicants for admission to the Arizona Bar; it consists of seven members of the State Bar selected from a list of nominees supplied by the Arizona State Bar Association's Board of Governors.[5]   Petitioners administered the 1974 bar examination which respondent took and failed.   In his complaint, respondent alleged that after the scores of each candidate were known, petitioners selected a particular score which would equal the passing grade.   The complaint alleges that the petitioners would adjust the grading formula in order to limit the number of persons who could enter the market and compete with members of the Arizona Bar.   In this manner, respondent was "artificially prevented from entering into competition as an attorney in the State of Arizona."[6]

The Arizona Supreme Court has instructed petitioners to recommend for admission to the Bar "[a]ll applicants who receive a passing grade in the general examination and who are found to be otherwise qualified . . . ."[7]   There is no indication that any criterion other than competence is appropriate under the Supreme Court's Rules for regulating admission to the Bar.[8]   Indeed with respect to respondent's application

---

[5] Ariz. Sup. Ct. Rule 28(a).

[6] See App. 10–11.

[7] Ariz. Sup. Ct. Rule 28(c) VIII.

[8] Petitioners certainly do not suggest the existence of any other criterion under Arizona law.   To the contrary, at oral argument they expressly acknowledged that there is no state policy adopting any criterion but competence for admission to the Bar.   Tr. of Oral Arg. 22–24.

for admission, the Arizona Supreme Court wrote: "The practice of law is not a privilege but a right, conditioned solely upon the requirement that a person have the necessary mental, physical and moral qualifications." *Application of Ronwin*, 113 Ariz. 357, 358, 555 P. 2d 315, 316 (1976), cert. denied, 430 U. S. 907 (1977). In short, one looks in vain in Arizona law, petitioners' briefs, or the pronouncements of the Arizona Supreme Court for an articulation of any policy beside that of admitting only competent attorneys to practice in Arizona.

Thus, respondent does not challenge any state policy. He contests neither the decision to license those who wish to practice law, nor the decision to require a certain level of competence, as measured in a bar examination, as a precondition to licensing. Instead, he challenges an alleged decision to exclude even competent attorneys from practice in Arizona in order to protect the interests of the Arizona Bar.

As we have often reiterated in cases that involve the sufficiency of a pleading, a federal court may not dismiss a complaint for failure to state a claim unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief.[9] The allegations of the complaint must be taken as true for purposes of a decision on the pleadings.[10]

A judge reading a complaint of this kind is understandably somewhat skeptical. It seems highly improbable that members of the profession entrusted by the State Supreme Court

---

[9] See *McClain* v. *Real Estate Bd. of New Orleans*, 444 U. S. 232, 246–247 (1980); *Lake Country Estates* v. *Tahoe Regional Planning Agency*, 440 U. S. 391, 397, n. 11 (1979); *Hospital Building Co.* v. *Trustees of Rex Hospital*, 425 U. S. 738, 746 (1976); *Scheuer* v. *Rhodes*, 416 U. S. 232, 236 (1974); *Conley* v. *Gibson*, 355 U. S. 41, 45–46 (1957).

[10] See *Hughes* v. *Rowe*, 449 U. S. 5, 10 (1980) *(per curiam); Cruz* v. *Beto*, 405 U. S. 319, 322 (1972) *(per curiam); California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508, 515–516 (1972); *Jenkins* v. *McKeithen*, 395 U. S. 411, 421 (1969) (plurality opinion); *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.*, 382 U. S. 172, 174–175 (1965).

with a public obligation to administer an examination system that will measure applicants' competence would betray that trust, and secretly subvert that system to serve their private ends. Nevertheless, the probability that respondent will not prevail at trial is no justification for dismissing the complaint. "Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." *Scheuer* v. *Rhodes,* 416 U. S. 232, 236 (1974). The Court does not purport to justify dismissal of this complaint by reference to the low probability that respondent will prevail at trial. Instead, it substantially broadens the doctrine of antitrust immunity, using an elephant gun to kill a flea.

## II

If respondent were challenging a restraint of trade imposed by the sovereign itself, this case would be governed by *Parker* v. *Brown,* 317 U. S. 341 (1943), which held that the Sherman Act does not apply to the sovereign acts of States. See *id.,* at 350–352. As the Court points out, the Arizona Supreme Court exercises sovereign power with respect to admission to the Arizona Bar; hence if the challenged conduct were that of the court, it would be immune under *Parker. Ante,* at 567–569.[11] The majority's conclusion that the challenged action was that of the Arizona Supreme Court is, however, plainly wrong. Respondent alleged that the decision to place an artificial limit on the number of lawyers was made by petitioners—not by the State Supreme Court. There is no contention that petitioners made that decision at the direction or behest of the Supreme Court. That court is not a petitioner, nor was it named as a defendant in respondent's complaint. Nor, unlike the Court, have petitioners suggested that the Arizona Supreme Court played any part in establishing the grading standards for the bar examination

---

[11] See *Bates* v. *State Bar of Arizona,* 433 U. S. 350, 359–360 (1977).

or made any independent decision to admit or reject *any* individual applicant for admission to the Bar.[12] Because respondent¹ is not challenging the conduct of the Arizona Supreme Court, *Parker* is simply inapplicable.

Any possible claim that the challenged conduct is that of the State Supreme Court is squarely foreclosed by *Goldfarb* v. *Virginia State Bar*, 421 U. S. 773 (1975). There an antitrust action was brought challenging minimum-fee schedules published by a county bar association and enforced by the State Bar pursuant to its mandate from the Virginia Supreme Court to regulate the practice of law in that State. After acknowledging that the State Bar was a state agency which had enforced the schedules pursuant to the authority granted it by the State Supreme Court, we stated a simple test for antitrust immunity:

> "The threshold inquiry in determining if an anticompetitive activity is state action of the type the Sherman Act was not meant to proscribe is whether the activity is *required* by the State acting as sovereign. Here we need not inquire further into the state-action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules *required* the anticompetitive activities of either respondent. Respondents have pointed to no Virginia statute requiring their activities; state law simply does not refer to fees, leaving regulation of the profession to the Virginia Supreme Court; although the Supreme Court's ethical codes mention advisory fee schedules they do not direct either respondent

---

[12] It should be noted that petitioners do not advance the imaginative argument on which this Court's decision rests—that the examination procedure is merely advisory and that the Arizona Supreme Court itself "made the final decision on each applicant." *Ante,* at 578 (footnote omitted). Presumably petitioners are more familiar with how their own procedures work than is this Court. The Court shows precious little deference to "administrative expertise" in its analysis of the facts.

to supply them, or require the type of price floor which arose from respondents' activities." *Id.*, at 790 (emphasis supplied) (citations omitted).

In *Bates* v. *State Bar of Arizona*, 433 U. S. 350 (1977), the Court applied the *Goldfarb* test to a disciplinary rule restricting advertising by Arizona attorneys that the Supreme Court itself "has imposed and enforces," 433 U. S., at 353:

"In the instant case . . . the challenged restraint is the affirmative command of the Arizona Supreme Court under its Rules 27(a) and 29(a) and its Disciplinary Rule 2–101(B). That court is the ultimate body wielding the State's power over the practice of law, see Ariz. Const., Art. 3; *In re Bailey*, 30 Ariz. 407, 248 P. 29 (1926), and, thus, the restraint is 'compelled by direction of the State acting as a sovereign.' 421 U. S., at 791 (footnote omitted)." *Id.*, at 359–360.

The test stated in *Goldfarb* and *Bates* is that the sovereign must *require* the restraint. Indeed, that test is derived from *Parker* itself: "We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities *directed* by its legislature [or supreme court]." 317 U. S., at 350–351 (emphasis supplied). Here, the sovereign is the State Supreme Court, not petitioners, and the court did not require petitioners to grade the bar examination as they did.[13] The fact that petitioners are part of a state agency under the direction of the sovereign is insufficient to cloak them in the sovereign's immunity; that much was also decided in *Goldfarb:*

---

[13] It is not surprising that petitioners (who must practice before the Arizona Supreme Court) did not advance the theory on which this Court relies—that their challenged conduct is actually conduct of the Arizona Supreme Court. They surely understand that they are not the court, but rather its subordinate.

"The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members. The State Bar, by providing that deviation from County Bar minimum fees may lead to disciplinary action, has voluntarily joined in what is essentially a private anticompetitive activity, and in that posture cannot claim it is beyond the reach of the Sherman Act." 421 U. S., at 791–792 (footnotes and citation omitted).

"*Goldfarb* therefore made it clear that, for purposes of the *Parker* doctrine, not every act of a state agency is that of the State as sovereign." *Lafayette* v. *Louisiana Power & Light Co.*, 435 U. S. 389, 410 (1978) (plurality opinion). Rather, "anticompetitive actions of a state instrumentality not compelled by the State acting as sovereign are not immune from the antitrust laws." *Id.*, at 411, n. 41. See also *id.*, at 425 (opinion of BURGER, C. J.); *Cantor* v. *Detroit Edison Co.*, 428 U. S. 579, 604 (1976) (opinion of BURGER, C. J.). An antitrust attack falls under *Parker* only when it challenges a decision of the sovereign and not the decision of the state bar which indisputably is not the sovereign. See *California Retail Liquor Dealers Assn.* v. *Midcal Aluminum, Inc.*, 445 U. S. 97, 104–105 (1980).[14] Here no decision of the sovereign, the Arizona Supreme Court, is attacked;[15] only a

---

[14] See also *New Motor Vehicle Board of California* v. *Orrin W. Fox Co.*, 439 U. S. 96, 109 (1978); *Cantor* v. *Detroit Edison Co.*, 428 U. S., at 593–595.

[15] In response to this dissent, the Court has advanced the theory that the relevant "state action" was the State Supreme Court's rejection of an original complaint filed in that court containing a "plethora of charges, including the substance of the complaint in this case." *Ante*, at 576–577. See also *ante*, at 582. Presumably, that complaint was simply deficient as a matter of state law; if the allegations of respondent's current complaint are taken as true then the fact that respondent failed the bar examination would have provided an adequate ground for the dismissal of respondent's complaint without any review of respondent's allegations. Even if it were the case

conspiracy of petitioners which was neither compelled nor directed by the sovereign is at stake. Since there is no claim that the *court* directed petitioners to artificially reduce the number of lawyers in Arizona, petitioners cannot utilize the sovereign's antitrust immunity.[16]

The majority's confused analysis is illustrated by its difficulty in identifying the sovereign conduct which it thinks is at issue here. To support its conclusion that the challenged action is that of the Arizona Supreme Court, the majority suggests that what respondent challenges is the court's decision to deny respondent's application for admission to the Bar. *Ante*, at 577–578, n. 30. I find nothing in the record to indicate that the court ever made such a decision. Respondent's complaint alleges only that petitioners "announced the results" of the bar examination. App. 9. In their answer, petitioners admitted this and added nothing else of significance. *Id.*, at 17. The Rules of the Supreme Court do not call for the court to deny the application of a person who has failed the bar examination; rather they state only that any "applicant aggrieved by any decision of the Committee . . . may within 20 days after such occurrence file a verified pe-

---

that the Arizona Supreme Court reviewed petitioner's complaint on its merits, all that would indicate is that the court has declined to exercise its power of revision with respect to petitioners' alleged anticompetitive policies. That is far different from having required petitioners to adopt those policies in the first place, which is what *Goldfarb* requires.

[16] The Court argues that "[o]nly the Arizona Supreme Court had the authority to grant or deny admission to practice in the State," *ante*, at 575–576 (footnote omitted), and therefore concludes that the challenged conduct is that of the court. But there is no allegation that the challenged policy was adopted by the court; at most the court has permitted it by accepting the recommendations of petitioners. Yet as *Bates* and *Goldfarb* make clear, the challenged policy must be required by the sovereign. The fact that the court retained the power to disapprove of the examination procedure adopted by petitioners is no different from the fact that the Virginia Supreme Court retained the power to disapprove of the fee schedules set by the bar association in *Goldfarb*. Similar powers of revision were held insufficient to justify immunity in *Lafayette*, *Cantor*, and *Midcal*.

tition with this Court for a review." Ariz. Sup. Ct. Rule 28(c) XII. Yet the Court disavows reliance on the Supreme Court's denial of Ronwin's petition, *ante*, at 577–578, n. 30,[17] and with good reason, see n. 15, *supra*.[18] Thus, if the Supreme Court did not itself deny Ronwin's application, if its denial of Ronwin's petition for review is irrelevant, and if the only criterion it ever required petitioners to employ was competence, it is difficult to see why petitioners should have immunity from the requirements of federal law if, as alleged, they took the initiative in employing a criterion other than competence. "It is not enough that . . . anticompetitive conduct is 'prompted' by state action; rather, anticompetitive activities must be compelled by direction of the State acting as a sovereign." *Goldfarb*, 421 U. S., at 791.

## III

It is, of course, true that the Arizona Supreme Court delegated to petitioners the task of administering the bar exam, and retained the authority to review or revise any action taken by petitioners. However, neither of these fac-

---

[17] While the majority's disavowal in its note 30 is quite unequivocal, at other points in its opinion, see *ante*, at 576–577, and in its ultimate statement of its holding, see *ante*, at 582, it does seem to rely on the denial of respondent's petition for review. If that truly is critical for the majority, then it would follow that an individual in respondent's position who did not file a petition for review would be able to mount an antitrust challenge free from the immunity barrier the majority erects. If it indeed is that easy to escape the majority's holding, then that holding will not protect bar examiners against the parade of horribles discussed by the majority *ante*, at 580, and n. 34.

[18] The cases the Court cites *ante*, at 577, n. 30, 581, all involve instances in which an applicant who had *passed* the bar examination was nevertheless not recommended for admission. If the applicant seeks judicial review, those cases indicate that the court will decide for itself whether to admit the applicant. However, none of those cases indicates that the court makes an independent decision, or indeed any decision at all, to deny the application of a person who has failed the bar examination.

tors is sufficient to accord petitioners immunity under the Sherman Act.

In *Bates*, the Court held that the State Bar's restrictions on attorney advertising qualified for antitrust immunity, 433 U. S., at 359–362, because "the state policy requiring the anticompetitive restraint as part of a comprehensive regulatory system, was one clearly articulated and affirmatively expressed as state policy, and that the State's policy was actively supervised by the State Supreme Court as the policymaker." *Lafayette*, 435 U. S., at 410 (plurality opinion) (footnote omitted). This Court has since "adopted the principle, expressed in the plurality opinion in *Lafayette*, that anticompetitive restraints engaged in by state municipalities or subdivisions must be 'clearly articulated and affirmatively expressed as state policy' in order to gain an antitrust exemption." *Community Communications Co.* v. *Boulder*, 455 U. S., at 51, n. 14 (quoting *Midcal*, 445 U. S., at 105).[19]

Here there is nothing approaching a clearly articulated and affirmatively expressed state policy favoring an artificial limit on the number of lawyers licensed to practice in Arizona. Indeed, the majority does not attempt to argue that petitioners satisfy this test. The only articulated policy to be found in Arizona law is that competent lawyers should be admitted to practice; indeed this is the only policy petitioners articulate in this Court. An agreement of the type alleged in respondent's complaint is entirely unrelated to any "clearly articulated and affirmatively expressed" policy of Arizona. While the Arizona Supreme Court may have permitted petitioners to grade and score respondent's bar examination as they did, *Parker* itself indicates that "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful . . . ." 317 U. S., at 351. The Arizona Supreme Court

---

[19] See also 455 U. S., at 51–52, 54; *Midcal*, 445 U. S., at 104–105; *New Motor Vehicle Board of California* v. *Orrin W. Fox Co.*, 439 U. S., at 109.

may permit the challenged restraint, but it has hardly required it as a consequence of some affirmatively expressed and clearly articulated policy. What we said of a state home-rule provision that permitted but did not require municipalities to adopt a challenged restraint on competition applies fully here:

> "[P]lainly the requirement of 'clear articulation and affirmative expression' is not satisfied when the State's position is one of mere *neutrality* respecting the municipal actions challenged as anticompetitive. A State that allows its municipalities to do as they please can hardly be said to have 'contemplated' the specific anticompetitive actions for which municipal liability is sought. . . . Acceptance of such a proposition—that the general grant of power to enact ordinances necessarily implies state authorization to enact specific anticompetitive ordinances—would wholly eviscerate the concepts of 'clear articulation and affirmative expression' that our precedents require." *Boulder*, 455 U. S., at 55–56 (emphasis in original).

Unless the Arizona Supreme Court affirmatively directed petitioners to restrain competition by limiting the number of otherwise qualified lawyers admitted to practice in Arizona, it simply cannot be said that its position is anything more than one of neutrality; mere authorization for anticompetitive conduct is wholly insufficient to satisfy the test for antitrust immunity. See *Midcal*, 445 U. S., at 105–106; *Lafayette*, 435 U. S., at 414–415 (plurality opinion).[20] No

---

[20] See also *Cantor* v. *Detroit Edison Co.*, 428 U. S., at 604–605 (opinion of BURGER, C. J.). In *Cantor*, the Court wrote:

"Respondent could not maintain the lamp-exchange program without the approval of the Commission, and now may not abandon it without such approval. Nevertheless, there can be no doubt that the option to have, or not to have, such a program is primarily respondent's, not the Commission's. Indeed, respondent initiated the program years before the regulatory agency was even created. There is nothing unjust in a conclusion

affirmative decision of the Arizona Supreme Court to restrain competition by limiting the number of qualified persons admitted to the Bar is disclosed on the present record. The alleged conspiracy to introduce a factor other than competence into the bar examination process is not the product of a clearly articulated and affirmatively expressed state policy and hence does not qualify for antitrust immunity.[21]

## IV

The conclusion that enough has been alleged in the complaint to survive a motion to dismiss does not warrant the further conclusion that the respondent is likely to prevail at

that respondent's participation in the decision is sufficiently significant to require that its conduct implementing the decision, like comparable conduct by unregulated businesses, conform to applicable federal law. Accordingly, even though there may be cases in which the State's participation in a decision is so dominant that it would be unfair to hold a private party responsible for his conduct in implementing it, this record discloses no such unfairness." *Id.*, at 594–595 (footnotes omitted).

[21] In this Court petitioners appear to have abandoned the argument, advanced for the first time in a petition for rehearing in the Court of Appeals, that the examination grading formula was actually approved by the State Supreme Court. Because the majority appears to revive this abandoned contention, *ante*, at 572–573, and n. 22, see also *ante*, at 576, it is necessary to address it, though that requires no more than brief reference to the Court of Appeals' opinion:

"Defendants contend for the first time on rehearing that the Committee's grading formula 'was submitted to the Court, reviewed by the Court, and accepted by the Court.' In response, Ronwin has tendered to this court what purports to be the letter the Committee filed with the Supreme Court on February 8, 1974 pursuant to Rule 28(c) (VII)(B). If, as Ronwin alleges, the Committee scored the examination to admit a pre-determined number of applicants, the letter does not so advise the court. Accordingly, if the letter presented to us constitutes the submission to the Supreme Court, it cannot be the basis for a clearly articulated and affirmatively expressed state policy. Although dismissal might have been proper if the facts were as defendants now argue for the first time on rehearing, those facts were never brought to the district court's attention. Dismissal

trial, or even that his case is likely to survive a motion for summary judgment. For it is perfectly clear that the admissions policy that is described in the Arizona Supreme Court's Rules does not offend the Sherman Act. Any examination procedure will place a significant barrier to entry into the profession; moreover, a significant measure of discretion must be employed in the administration of testing procedures. Yet ensuring that only the competent are licensed to serve the public is entirely consistent with the Sherman Act. See *Goldfarb*, 421 U. S., at 792–793.[22]

The Court is concerned about the danger that because thousands of aspirants fail to pass bar examinations every year, "affirmance of the Court of Appeals in this case could well invite numerous suits" questioning bar examiners' motives; the Court fears that the burdens of discovery and trial and "the threat of treble damages" will deter "'able citizens' from performing this essential public service." *Ante*, at 580–581, n. 34. The Court is, I submit, unduly alarmed.[23] A

was therefore improper on the basis of the information before the district court." *Ronwin* v. *State Bar of Arizona*, 686 F. 2d 692, 697 (CA9 1981). It is, of course, equally improper for this Court to rely on evidence not presented to the District Court as a basis for holding that the complaint was not sufficient to withstand a motion to dismiss. See *Adickes* v. *S. H. Kress & Co.*, 398 U. S. 144, 157–158, n. 16 (1970).

[22] See generally *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332, 348–349 (1982); *National Society of Professional Engineers* v. *United States*, 435 U. S. 679, 696 (1978).

[23] The majority makes the rather surprising suggestion that under the well-settled principles I have discussed, those who advise state legislatures on legislation which restrains competition could be sued under the Sherman Act. *Ante*, at 580. Such persons of course would have a complete defense since in such a case they would have been delegated no power which could be used to restrain competition and hence cannot be liable for a restraint they did not impose. Moreover, the Sherman Act protects the right to seek favorable legislation, even if the reason for doing so is to injure competitors. See *California Motor Transport Co.* v. *Trucking Unlimited*, 404 U. S. 508 (1972); *Eastern Railroad Presidents Conference*

denial of antitrust immunity in this case would not necessarily pose any realistic threat of liability, or even of prolonged litigation. Respondent must first produce sufficient evidence that petitioners have indeed abused their public trust to survive summary judgment, a task that no doubt will prove formidable.[24] Moreover, petitioners' motives will not necessarily be relevant to respondent's case. If the proof demonstrates that petitioners have adopted a reasonable means for regulating admission to the Arizona Bar on the basis of competence, respondent will be unable to show the requisite adverse effect on competition even if the subjective motivation of one or more bar examiners was tainted by sinister self-interest. Indeed, even if respondent can show that he was "arbitrarily" denied admission to the Bar for reasons unrelated to his qualifications, unless he can also show that this occurred as part of an anticompetitive scheme, his antitrust claim will fail.

In any event, there is true irony in the Court's reliance on these concerns. In essence, the Court is suggesting that a special protective shield should be provided to lawyers because they—unlike bakers, engineers, or the members of any other craft—may not have sufficient confidence in the ability of our legal system to identify and reject unmeritorious claims to be willing to assume the ordinary risks of litigation associated with the performance of civic responsibilities. I do not share the Court's fear that the administration of bar

---

v. *Noerr Motor Freight, Inc.*, 365 U. S. 127 (1961). The majority's focus on cases not before the Court surely reflects the weakness of its position with respect to the case that is here.

[24] In order to preserve the secrecy of bar examination questions, the test must vary from year to year; after a test has been given, it may become apparent that the anticipated passing grade should be adjusted in order to provide roughly the same measure of competence as was used in prior years. Thus respondent's burden of proving the conspiracy he has alleged requires far more than evidence that petitioners exercised discretion in setting the passing grade after the results were known.

examinations by court-appointed lawyers cannot survive the scrutiny associated with rather ordinary litigation that persons in most other walks of life are expected to endure.

The Court also no doubt believes that lawyers—or at least those leaders of the bar who are asked to serve as bar examiners—will always be faithful to their fiduciary responsibilities. Though I would agree that the presumption is indeed a strong one, nothing in the sweeping language of the Sherman Act justifies carving out rules for lawyers inapplicable to any other profession. In *Goldfarb* we specifically rejected such parochialism. Indeed, the argument that it is unwise or unnecessary to require the petitioners to comply with the Sherman Act "is simply an attack upon the wisdom of the longstanding congressional commitment to the policy of free markets and open competition embodied in the antitrust laws." *Boulder*, 455 U. S., at 56. We should not ignore that commitment today.

Denial of antitrust immunity in this case would hardly leave the State helpless to cope with felt exigencies; should it wish to do so, the Arizona Supreme Court remains free to give petitioners an affirmative direction to engage in the precise conduct that respondent has alleged. The antitrust laws hardly create any inescapable burdens for the State; they simply require that decisions to displace the free market be made overtly by public officials subject to public accountability, rather than secretly in the course of a conspiracy involving representatives of a private guild accountable to the public indirectly if at all. See *id.*, at 56–57; *Lafayette*, 435 U. S., at 416–417 (plurality opinion). "The national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." *Midcal*, 445 U. S., at 106.

The practical concerns identified by the Court pale when compared with the principle that should govern the decision

of this case. The rule of law that applies to this case is applicable to countless areas of the economy in which arbitrary restraints on entry may impose the very costs on the consuming public which the antitrust laws were designed to avoid.[25] Experience in the administration of the Sherman Act has demonstrated that there is a real risk that private associations that purport merely to regulate professional standards may in fact use their powers to restrain competition which threatens their members.[26] It is little short of irresponsible to tear a gaping hole in the fabric of antitrust law simply because we may be confident that respondent will be unable to prove what he alleges.

---

[25] The conspiracy respondent has alleged, if proved, would have no procompetitive justification at all; it would be plainly inconsistent with the goals of the Sherman Act. Thus petitioners' claim of antitrust immunity arises in the least defensible context:

"[A]s a general proposition . . . state-sanctioned anticompetitive activity must fall like any other if its potential harms outweigh its benefits. This does not mean that state-sanctioned and private activity are to be treated alike. The former is different because the fact of state sanction figures powerfully in the calculus of harm and benefit. If, for example, the justification for the scheme lies in the protection of health or safety, the strength of that justification is forcefully attested to by the existence of a state enactment. . . . A particularly strong justification exists for a state-sanctioned scheme if the State in effect has substituted itself for the forces of competition, and regulates private activity to the same ends sought to be achieved by the Sherman Act. Thus, an anticompetitive scheme which the State institutes on the plausible ground that it will improve the performance of the market in fostering efficient resource allocation and low prices can scarcely be assailed." *Cantor* v. *Detroit Edison Co.*, 428 U. S., at 610–611 (BLACKMUN, J., concurring in judgment).

[26] See, *e. g.*, *Arizona* v. *Maricopa County Medical Society*, 457 U. S. 332 (1982); *American Society of Mechanical Engineers, Inc.* v. *Hydrolevel Corp.*, 456 U. S. 556 (1982); *National Society of Professional Engineers* v. *United States*, 435 U. S. 679 (1978); *Silver* v. *New York Stock Exchange*, 373 U. S. 341 (1963); *American Medical Assn.* v. *United States*, 317 U. S. 519 (1943); *Fashion Originators' Guild of America, Inc.* v. *FTC*, 312 U. S. 457, 465–466 (1941).

Frivolous cases should be treated as exactly that, and not as occasions for fundamental shifts in legal doctrine.[27] Our legal system has developed procedures for speedily disposing of unfounded claims; if they are inadequate to protect petitioners from vexatious litigation, then there is something wrong with those procedures, not with the law of antitrust immunity. That body of law simply does not permit the Sherman Act to be displaced when neither the state legislature nor the state supreme court has expressed any desire to preclude application of the antitrust laws to the conduct of those who stand to benefit from restraints of trade. A healthy respect for state regulatory policy does not require immunizing those who abuse their public trust; such a thin veneer of state involvement is insufficient justification for casting aside the competitive ideal of the Sherman Act. The commitment to free markets and open competition that has evolved over the centuries and is embodied in the Sherman Act should be sturdy enough to withstand petitioners' flimsy claim. That claim might have merited the support of the 14th-century guilds; today it should be accorded the "punishment of the hurdle."

I respectfully dissent.

---

[27] If, as seems likely, respondent's claim proves insubstantial, it should be dealt with in the same manner as other such claims—by means of summary judgment, perhaps coupled with an award of attorneys' fees should it also develop that this case was "unreasonably and vexatiously" brought. See 28 U. S. C. § 1927.