AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO, as Trustee under Trust Agreement dated February 9, 1965, and known as Trust No. 21314, Morton J. Crane, Joseph L. Katz and Ralph R. Michelson, Plaintiffs,

v.

BOARD OF REGENTS FOR REGENCY UNIVERSITIES, a body corporate and politic, Defendant.

No. 83 C 3559.

United States District Court,
N.D. Illinois, E.D.

Nov. 20, 1984.

ROSZKOWSKI, District Judge.

## ORDER

Before the court is defendant's motion to dismiss and/or for summary judgment. The court's subject matter jurisdiction is asserted to rest upon 28 U.S.C. § 1331 (1982). For the reasons set forth herein, defendant's motion to dismiss is denied and defendant's motion for summary judgment is granted, in part, and denied, in part.

## BACKGROUND

Plaintiffs are the owners of a private dormitory adjacent to the campus of Northern Illinois University ("University"). Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act seeking damages and injunctive relief. Plaintiffs allege the implementation of certain University housing policies are in violation of Sections 1 and 2 of the Sherman Act.

Defendant, Board of Regents For Regency Universities, a body corporate and politic, is a public entity responsible for the ownership, operation and management of University-owned residence halls. The defendant is also responsible for the promulgation of policies and regulations regarding places of residence on and off campus where students may live.

At issue in the present case is the *implementation* of a certain parietal rule promulgated by the defendant. The subject rule requires that single, freshmen students under the age of 21 not residing with their parents must reside in one of the University residence halls so long as space remains available.

Plaintiffs do not challenge the defendant's authority to make such parietal rules. (Plaintiffs' Memo. p.23) Instead, plaintiffs merely challenge certain "temporary housing practices" followed by the defendant in implementing the subject rule.

The challenged temporary housing practices are alleged to include: (1) "the implementation of 'temporary' housing, whereby students are housed in non-dormitory rooms indefinitely," and (2) the delaying of "advice to applicants as to whether or when they can be assured a permanent assignment, until so shortly before the commencement of the school year as to

preclude plaintiffs from a realistic entry into the market." (Plaintiff's Memo. p.2) As a result, plaintiffs contend the "[d]efendant has admittedly commenced and pursued a practice of violating its own 'parietal' policies by continuing to impose the requirement [that single, freshmen students under the age of 21 must reside in the University residence halls so long as space remains available] when space is *not* available." (Plaintiffs' Memo. p.24)

Defendant stresses that its so-called "temporary housing practices" merely present freshmen students with the *option* of residing in temporary housing until a permanent University residence hall assignment becomes available. The letter directed to incoming freshmen concerning temporary University housing merely provides, "[i]f you do NOT accept this assignment you are free to move off campus...." Defendant contends it offers this option to incoming freshmen because experience has shown "that each year there will inevitably be a number of students for whom University housing has been reserved that will either decide not to attend the University or leave early in the semester." (Defendant's Reply p.12) Thus, defendant contends it has adopted the challenged housing policy "[i]n order to account for this attrition factor and to provide University housing to all those who desire it...." (*Id.*)

Defendant has moved to dismiss and/or for summary judgment on three grounds: (1) that plaintiff's claim is barred by laches; (2) that plaintiffs' action for monetary damages is barred under the doctrine of sovereign immunity; and (3) that defendant's actions are "state actions" exempt from federal antitrust laws.

### I. Laches

■ Defendant initially argues that plaintiffs' action is barred under the doc-

trine of laches.[1] Laches bars an equitable action where a party's unexcused or unreasonable delay has prejudiced his adversary. *Boone v. Mechanical Specialties*, 609 F.2d 956, 958 (9th Cir.1979). Defendant contends the plaintiffs knew or should have known of its parietal rule prior to commencing the construction of their private dormitory in 1965. In addition to the length of the delay, defendant contends it has been prejudiced by the loss, through resignation, retirement and death, of many of the individuals involved in formulating its housing policies since that time. Thus, defendant contends laches should bar plaintiffs' action.

■ Defendant's argument mischaracterizes the nature of the plaintiffs' action. Plaintiffs are not challenging the parietal rule requiring that single, freshmen students under the age of 21 not residing with their parents reside in University residence halls so long as space remains available. Instead, plaintiffs are challenging the *implementation* of that parietal rule through defendant's temporary housing practices. The latter practices were not commenced until the Fall of 1981.[2] Thus, in view of the brief passage of time and the defendant's failure to show any specific prejudice, defendant's motion to dismiss on the basis of laches is denied.

### II. Sovereign Immunity

■ Defendant next asserts that plaintiffs' claim for monetary damages must be dismissed on the grounds of the Eleventh Amendment's sovereign immunity doctrine. *Quern v. Jordan*, 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979). The parties agree that the application of the sovereign immunity doctrine depends upon whether the defendant is considered to be an "arm of the state" or merely a "political subdivision of the state." If the defendant is a mere "political subdivision" of the state, then its actions are not protected by

---

**1.** Defendant did not address the issue of laches in its reply brief.

**2.** While the defendant allegedly followed similar practices in 1963–67, the plaintiffs' dormitory was not in operation during the vast majority

of that time. Once the dormitory was in existence, the defendant's temporary housing practices apparently ceased relatively rapidly. Thus, no action was necessary at that time.

the doctrine of sovereign immunity. *Id.* at 341 n.12, 99 S.Ct. at 1145 n. 12, 59 L.Ed.2d at 367 n. 12. In determining whether the defendant is an arm of the state, the single most important inquiry is whether or not any judgment against the defendant would be paid from public funds in the State treasury. *Ranyard v. Board of Regents,* 708 F.2d 1235, 1238 (7th Cir.1983).

In *McGuire v. Board of Regents of Northern Illinois University,* 71 Ill.App.3d 998, 28 Ill.Dec. 465, 390 N.E.2d 632 (4th Cir.1979), the Illinois Appellate Court was called upon to decide whether the Illinois Court of Claims has exclusive jurisdiction over breach of contract actions brought against the defendant Board of Regents. The Illinois State Immunity Act provides, in relevant part, that "the State of Illinois shall not be made a defendant or party in any court." ILL.REV.STAT. ch. 127, ¶ 801. A limited waiver of this immunity is provided for certain actions brought against the State in the Illinois Court of Claims. Specifically, the Court of Claims is granted exclusive jurisdiction to hear "[a]ll claims against the state founded upon any contract entered into with the State of Illinois." ILL.REV.STAT. ch. 37, ¶ 439.8(b).

In determining whether or not the Court of Claims had exclusive jurisdiction over the breach of contract action against the defendant, the court applied a test strikingly similar to the test imposed for Eleventh Amendment sovereign immunity. The court recognized that "... if the relief sought could operate to control the action of the state *or subject it to liability,* the suit is deemed to be against the state." (emphasis added) 390 N.E.2d at 634. Applying that test to the defendant, the court concluded, "[w]ithout recitation of detail, examination of the statutory provisions creating the Regency Universities and granting their powers disclose that such provisions meet the criteria of an arm or agency of the state...." *Id.* Thus, the

court held the Illinois Court of Claims has exclusive jurisdiction over any breach of contract action against the defendant. 390 N.E.2d at 635.

■ This court's own independent review of the relevant Illinois statutes reveals a more than adequate basis exists for concurring with the Illinois Appellate Court's express finding that the defendant is an arm or agency of the State. The nine individual members of the defendant Board of Regents are appointed by the Governor by and with the advice and consent of the State Senate. (ILL.REV.STAT. ch. 144, ¶ 302) The statutory powers of the defendant are subject to the powers and duties of the Illinois Board of Higher Education. (ILL.REV.STAT. ch. 144, ¶ 309) Much of the "revenue" received by the defendant must "be paid into the state treasury without delay and ... covered into a special fund to be known as the Board of Regents Income Fund." (ILL.REV.STAT. ch. 127, ¶ 142a4) Once in the Regents Income Fund, the funds are payable by General Assembly appropriations and are subject to audit by the Illinois Auditor General. *Id.* These revenues include "tuition, laboratory, library fees, and any interest that may be earned thereon..." as well as any excess "revenues" derived by Regency Universities from the operation of student or staff residence facilities, student and staff medical and health programs, Union Buildings, bookstores, farms and other auxiliary enterprises or activities. *Id.* Finally, the defendant's title to all other property, real and personal, is "held for the People of the State of Illinois." (ILL.REV. STAT. ch. 144, ¶ 306, 307) As such, the property's control and disposition is governed by the State Property Control Act. (ILL.REV.STAT. ch. 127, ¶ 133b1–133b13) [3]

■ In view of this court's own examination of the applicable Illinois statutes

---

**3.** In addition, certain other unrelated state statutes evidence that the defendant is an arm of the State. The Illinois statute governing the Representation and Indemnification of State Employees, ILL.REV.STAT. ch. 127, ¶ 1301, defines the term "State" as including "the govern-

ing boards of the public institutions of higher education created by the State." *Id.* Significantly, municipalities or other units of local government are not included in the Act's definition of state.

and the Illinois Appellate Court's decision in *McGuire,* it is clear that the defendant is considered to be "an arm of the State" and not a mere "political subdivision." Any monetary judgment against the defendant, therefore, would subject the State to liability.[4] As a result, the Eleventh Amendment bars the plaintiffs' claim for monetary damages against the defendant.[5] *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Plaintiffs' claim for injunctive relief, however, continues to be viable. *Id.* at 664–65, 94 S.Ct. at 1356–57.

## III. State Action

The single remaining issue before the court is whether the defendant is immunized from liability based upon the "state action" doctrine recognized in *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* the Supreme Court held that the Federal antitrust laws do not prohibit a state "as sovereign" from imposing certain anticompetitive restraints as an act of government. In subsequent decisions, the Court has struggled with the application of state action immunity to sovereign governmental entities such as state legislatures and supreme courts, non-sovereign governmental units such as state agencies and municipalities, and non-sovereign private organizations. *See Hoover v. Ronwin,* —— U.S. ——, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (application to the Arizona Supreme Court); *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982) (application to a home rule municipality); *California Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (application to a private association authorized to administer a state price maintenance program); *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978) (application to municipalities); and *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) (application to a "state agency.").

In determining whether or not "state action" immunity is available to the defendant in the present case, the parties have focused their arguments upon the two-pronged test set forth by the Supreme Court in *California Retail Liquor Dealers v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). For "state action" immunity to apply, the court in *Midcal* held: (1) the challenged conduct must be one clearly articulated and affirmatively expressed as a state policy, and (2) it must be actively supervised by the state. In *Midcal,* the party accused of anticompetitive conduct was a private association.

■ Subsequent lower court decisions, including a recent decision in this Circuit, have ignored the requirement of active supervision, however, when the party accused of anticompetitive conduct is a governmental agency or municipality. *Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 383–85 (7th Cir.1983) *cert. granted,* —— U.S. ——, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984); *see*

4. While one member of the court reached the same result in *Ranyard v. Board of Regents,* 708 F.2d 1235 (7th Cir.1983), the majority decided not to reach the issue. *See* concurring opinions *Id.* at 1240.

5. Even assuming the defendant would ordinarily be entitled to claim sovereign immunity, plaintiffs contend the defendant has waived that immunity here. Section 7 b of the Regency Universities Act provides the defendant has the power:

to sue and be sued, provided that any suit against the Board based upon a claim sounding in tort must be filed in the Court of Claims.

Plaintiffs contend that "the 'sue and be sued' clause was intended to be general in nature and that the only restriction to the Court of Claims applies to claims 'sounding in tort' ". Plaintiffs' proposed construction was expressly rejected in *McGuire v. Board of Regents of Northern Illinois University,* 71 Ill.App.3d 998, 28 Ill.Dec. 465, 390 N.E.2d 632 (4th Cir.1979). Thus, since this court does not construe the subject clause as a single restriction on a general waiver and since the "to sue and be sued" language, taken alone, has been held only to waive the state's immunity from suit to the extent a suit is maintainable in the Illinois Court of Claims, *McDonald v. State of Illinois,* 557 F.2d 596, 600–01 (7th Cir.) *cert. denied,* 434 U.S. 966, 98 S.Ct. 508, 54 L.Ed.2d 453 (1977), plaintiffs' claim of waiver must be denied.

also *Hybud Equipment Corp. v. City of Akron, Ohio,* 742 F.2d 949, 957 (6th Cir. 1984); *Central Iowa Refuse Systems, Inc. v. Des Moines Metropolitan Solid Waste Agency,* 715 F.2d 419, 425 (8th Cir.1983). In the view of this court, therefore, only the first prong of the *Midcal* test is applicable here.

In determining whether or not the challenged conduct was clearly articulated and affirmatively expressed as a state policy, courts have applied various tests. In *Hybud Equipment Corp. v. City of Akron, Ohio,* 742 F.2d 949 (6th Cir.1984), the Court concluded:

> If the challenged restraints are reasonably related to an agency's express powers and reasonably designed to promote the state aims within a designated field of regulation, they can be found to result from a 'clearly and affirmatively expressed state policy' to displace competition. *Id.* at 960–61.

Similarly, the Seventh Circuit recently held:

> If the state authorizes certain conduct, we can infer that it condones the anticompetitive effect that is a reasonable or reasonably foreseeable consequence of engaging in the authorized activity. * * * ...[s]tate compulsion [to engage in anticompetitive activity] is not required.

*Town of Hallie v. City of Eau Claire,* 700 F.2d 376, 381 (7th Cir.1983) *cert. granted,* —— U.S. ——, 104 S.Ct. 3508, 82 L.Ed.2d 818 (1984).

In the present case, §§ 5.5 and 5.8 of the Board of Regents Revenue Bond Act, ILL. REV.STAT. ch. 144, ¶ 355.5 and 355.8 (1982), grant the defendant the power:

> To make and enforce and agree *to make and enforce parietal rules that shall insure the use of any project to the maximum extent to which such project is capable of serving students, staff members and others using or being served by, or having the right to use or the right to be served by, or to operate, any project.*

>         \*     \*     \*     \*     \*     \*

> To covenant to perform any and all acts and to do any and all such things as may be necessary or convenient or desirable in order to secure its bonds, or as may in the judgment of the Board tend to make the bonds more marketable, notwithstanding that such acts or things may not be enumerated herein, it being the intention thereof to give the Board issuing bonds pursuant to this Act power to make all covenants, to perform all acts and to do all things not inconsistent with the constitution of the State of Illinois. (emphasis added)

If the defendant's parietal rule requiring single, freshmen students under the age of 21 not residing with their parents to reside in University residence halls so long as space remains available was the source of the plaintiffs' complaint, the court would have little difficulty in resolving the present motion. The subject rule is reasonably designed to further Illinois' express state policy of "... insur[ing] the use of [University residence halls] to the maximum extent to which such [residence halls] [are] capable of serving students, staff members and others...." ILL.REV. STAT. ch. 144, ¶ 355.5 (1982). Moreover, the subject rule is a reasonably foreseeable consequence of the Board's statutorily required efforts "... to secure its bonds ... [and] make the bonds more marketable...." ILL.REV.STAT. ch. 144, ¶ 355.8 (1982).

At issue in the present case, however, is the defendant's *implementation* of the subject parietal rule. From the limited record before the court, it appears the defendant continues to assign incoming freshmen "temporary housing" after space is no longer available. Although incoming freshmen are informed that they are not required to accept their temporary assignments, some question remains concerning the nature and timing of the information provided to them. Plaintiffs allege the defendant delays advising applicants as to whether or when they can be assured of receiving a permanent assignment. As a result, incoming freshmen are allegedly housed in non-dormitory rooms on an indef-

inite basis and plaintiffs are precluded from a realistic entry into the market.

While a policy allowing incoming freshmen to voluntarily accept temporary housing assignments with the expectation that normal attrition will result in their receiving permanent assignments within a reasonable time would appear to be reasonably designed to further the same interests previously discussed, it is not clear that any intentional delay or misrepresentation aimed at inducing incoming freshmen to pay University residence hall room and board without any realistic expectation of receiving a permanent assignment would be reasonably related to the defendant's express powers or reasonably designed to promote the State's economic or educational aims. Absent evidence relating to the length of the alleged delays, the information given to students concerning the likely duration of their temporary housing assignments and the information given to students concerning the likelihood of their obtaining a permanent housing assignment, it is, therefore, difficult to determine whether the defendant's implementation of its parietal rules is in furtherance of a clearly articulated and affirmatively expressed state policy.[6] The parties have failed to specifically address any of these factual issues and the court is not prepared to rule based upon the present state of the record.[7] Thus, defendant's motion for summary judgment based upon the state action immunity doctrine is denied.

### CONCLUSION

For all of the reasons set forth herein, defendant's motion to dismiss based upon the doctrine of laches is denied and defendant's motion for summary judgment based upon sovereign immunity and "state action" immunity is granted, in part, and denied, in part. Plaintiffs will be allowed to seek only injunctive relief.

Due to limited factual issues remaining and the unavailability of monetary damages, this court believes a pretrial conference may be helpful in voluntarily resolving the remaining issues in this case. Thus, the parties are ordered to appear for a pre-trial settlement conference on Thursday, December 20, 1984 at 11:00 a.m. in Chicago, Illinois. The parties are instructed to have some individual in attendance with authority to settle this matter.

---

6. Assuming the plaintiffs are able to prove that the defendant delays informing incoming freshmen of whether or when a permanent room assignment will become available and as a result incoming freshmen are indefinitely residing in non-dormitory rooms without any realistic expectation of receiving a permanent assignment, the plaintiffs will have proven facts taking the instant action outside the scope of the state immunity doctrine. Allowing additional students to indefinitely reside in non-dormitory rooms without any realistic expectation of receiving a permanent assignment is not reasonably designed "... to insure the use of [a residence hall] to the *maximum* extent to which [a residence hall] is capable of *serving* students,

staff members and others...." (emphasis added) (ILL.REV.STAT. ch. 144, ¶ 355.5 (1982). Rather, the likely result of such a policy would be *over-crowding* and, as a consequence, a reduction in service.

7. While the letter directed to incoming freshmen makes some representations about the likelihood of any eventual delay in obtaining a permanent assignment, the veracity of those representations has not been tested. Moreover, plaintiffs may be able to prove the existence of certain oral statements contradicting the subject letter.