**PRECEDENTIAL**


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1746
_____

EDINBORO COLLEGE PARK APARTMENTS;
DARROW PLACE PARTNERSHIP;
DARROW PLACE PARTNERSHIP II;
JAMES MANOR OF EDINBORO, LLC,
                                        Appellants


v.


EDINBORO UNIVERSITY FOUNDATION;
*H. FRED WALKER, Ph.D

* (Pursuant to Rule 43(c)(2), Fed. R. App. P.)
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court No. 1-15-cv-00121
District Judge: The Honorable Barbara Jacobs Rothstein

Argued November 9, 2016

Before: SMITH, *Chief Judge*, McKEE and RESTREPO,
*Circuit Judges*

(Filed: March 9, 2017)

Matthew L. Wolford                    **[ARGUED]**
638 West Sixth Street
Erie, PA  16507
    *Counsel for Appellants*


Joseph S.D. Christof, II
Dickie McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA  15222


Matthew W. McCullough          **[ARGUED]**
Mark T. Pavkov
James R. Walczak
MacDonald Illig Jones & Britton
100 State Street
Suite 700
Erie, PA  16507
     *Counsel for Appellee*
     *Edinboro University Foundation*


Thomas L. Donahoe
Kemal A. Mericli                      **[ARGUED]**

2

Office of Attorney General of Pennsylvania
564 Forbes Avenue
6th Floor, Manor Complex
Pittsburgh, PA  15219
> *Counsel for Appellee Julie E. Wollman & H. Fred Walker*

————————————

## OPINION

————————————

SMITH, *Chief Judge.*

Under *Parker v. Brown*, 317 U.S. 341 (1943), state action is immune from Sherman Act antitrust liability. This case presents the question of whether a public university, Edinboro University of Pennsylvania of the State System of Higher Education ("the University"), and its nonprofit collaborator, Edinboro University Foundation ("the Foundation"), are entitled to such immunity. On defendants' motions to dismiss, the District Court held that *Parker* immunity automatically applies to the University because the University is an arm of the state.

Although dismissal was appropriate, the District Court painted with too broad a brush. The University's actions are not categorically "sovereign" for purposes of *Parker* immunity. Because of that, we are required to apply heightened scrutiny. We conclude that the appropriate standard is derived from the Supreme Court's decision in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985), which requires anticompetitive conduct to conform to a clearly articulated state policy. We further conclude that, taking the allegations in the Amended Complaint in the light most favorable to plaintiffs, the University's conduct withstands *Hallie* scrutiny. Furthermore, because the Foundation's actions were directed by the University, the Foundation is also immune. We will affirm in part on those alternative grounds and remand with the instruction that the Amended Complaint be dismissed without prejudice.

I

This case arises out of the need for student housing at Edinboro University, a public university located in Edinboro, Pennsylvania. Plaintiffs are private business entities that provide off-campus residential housing near the University. According to plaintiffs, the University conspired with Edinboro University Foundation, a nonprofit entity that conducts fundraising on behalf of

4

the University, to monopolize the student-housing market.

Public higher education in Pennsylvania operates under a series of constitutional, legislative, and administrative mandates. The Pennsylvania Constitution requires the General Assembly to "provide for the maintenance and support of a thorough and efficient system of public education to serve the needs of the Commonwealth." Pa. Const. art. III, § 14. The General Assembly, in turn, enacted legislation creating the Pennsylvania State System of Higher Education, or "PASSHE." *See* 24 P.S. § 20-2002-A(a). PASSHE is "a body corporate and politic," *id.*, governed by a chancellor and the Board of Governors, *see id.* §§ 20-2004-A, 20-2005-A. Edinboro University is one of fourteen constituent institutions of the PASSHE system. *Id.* § 20-2002-A(a). The University is governed by its president and Council of Trustees. *See id.* §§ 20-2007-A, 20-2008-A.

At issue in this case is the University's decision to collaborate with the Foundation in order to construct new dormitories called the Highlands. In January 2008, the Foundation amended its Articles of Incorporation to authorize borrowing funds "to acquire, lease, construct, develop and/or manage real or personal property." Am. Compl. ¶ 19. The Foundation then signed a "Cooperation

5

Agreement" with the University: the University would lease certain property to the Foundation in a favorable location, and in turn the Foundation would finance, construct, and manage the Highlands dormitories. The Foundation issued bonds to raise the funds and began construction.

Plaintiffs aver that, after construction was completed, the University took anticompetitive measures to ensure that the Foundation recouped its investment. Since 1989, the University maintained a "parietal rule" requiring non-commuting first-year and transfer students to reside on-campus for two consecutive semesters. On May 6, 2011, two and one-half years after the first phase of the Highlands dormitories opened, the University amended its policy to require certain students to reside on-campus for *four* consecutive semesters or until they complete at least 59 credit hours.

Plaintiffs brought suit, asserting that the University and the Foundation conspired to monopolize the student-housing market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[1] The Amended Complaint states that

---

[1] Although not relevant to this appeal, plaintiffs also asserted a claim for tortious interference arising under state law.

plaintiffs experienced a 50% decline in business after the University expanded its on-campus residency requirement. Plaintiffs also aver that this conduct harms students by forcing them to pay higher rates for housing and participate in the University's meal plans.

Plaintiffs did not sue the University, conceding that the University is an arm of the state subject to immunity under the Eleventh Amendment.[2] Instead, plaintiffs sued the Foundation and the University's president in her official capacity for prospective relief pursuant to *Ex parte Young*, 209 U.S. 123 (1908).[3]

---

[2] Because the University is not a party to this case, we need not address whether it is entitled to Eleventh Amendment immunity. *See Maliandi v. Montclair State Univ.*, 845 F.3d 77, 85 (3d Cir. 2016) ("[E]ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances . . . ." (citation omitted)); *Skehan v. State Sys. of Higher Educ.*, 815 F.2d 244, 249 (3d Cir. 1987) (holding that PASSHE was entitled to Eleventh Amendment immunity).

[3] At the time plaintiffs filed suit, the University's president was Julie E. Wollman, Ph.D. Dr. Wollman's

7

By Order dated March 1, 2016, the District Court dismissed plaintiffs' Amended Complaint with prejudice on the ground that defendants' conduct constitutes state action immune from Sherman Act antitrust liability under the *Parker* doctrine. *See Edinboro Coll. Park Apartments v. Edinboro Univ. Found.*, No. 15-cv-121, 2016 WL 6883295 (W.D. Pa. Mar. 1, 2016). This timely appeal followed.

II

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review of a district court's order granting a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, and apply the same standard as does the District Court. *In re Vehicle Carrier Servs. Antitrust Litig.*, 846 F.3d 71, 79 n.4 (3d Cir. 2017). Under this standard, the complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)) (internal quotation marks omitted). In evaluating the sufficiency of the allegations, "we disregard rote recitals

---

successor and the current president of the University is H. Fred Walker, Ph.D.

of the elements of a cause of action, legal conclusions, and mere conclusory statements." *Id.* (quoting *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012)).

III

We begin with an overview of the applicable law. In *Parker v. Brown*, 317 U.S. 341 (1943), the Supreme Court held that the Sherman Act does not prohibit anticompetitive state action. That ruling embodies "the federalism principle that the States possess a significant measure of sovereignty under our Constitution." *Cmty. Cmmc'ns Co. v. City of Boulder*, 455 U.S. 40, 53 (1982). States may "impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101, 1109 (2015). Without *Parker* immunity, "federal antitrust law would impose an impermissible burden on the States' power" to subordinate market competition to "other values a State may deem fundamental." *Id.*

Then nearly half a century after *Parker*, the Supreme Court clarified that "state-action immunity is disfavored." *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 636 (1992). To ensure that the doctrine is appropriately limited, the Supreme Court has devised three approaches

to analyzing a state-action defense: (1) *ipso facto* immunity, (2) *Midcal* scrutiny, and (3) *Hallie* scrutiny. Which test applies depends on whether the relevant actor is comparable to a sovereign power, a private business, or something in between.

The doctrine of *ipso facto* immunity is the least searching. Once it is determined that the relevant action is "an undoubted exercise of state sovereign authority" undertaken by an actor "whose conduct . . . automatically qualif[ies] as that of the sovereign state itself," that conduct is immune without the need for any further analysis. *Dental Exam'rs*, 135 S. Ct. at 1110–11 (2015); *see A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 258 (3d Cir. 2001) (immunity for "direct state action" applies "only when the allegedly anticompetitive behavior was the direct result of acts within the traditional sovereign powers of the state"). The Supreme Court has recognized only two such contexts: (1) acts of state legislatures, and (2) "decisions of a state supreme court, acting legislatively rather than judicially." *Hoover v. Ronwin*, 466 U.S. 558, 568 (1984); *see Parker*, 317 U.S. at 350–51 ("We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature."). The Supreme Court has rejected *ipso facto* immunity for entities that

10

are "state agenc[ies] for some limited purposes." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 791 (1975).

The most searching level of scrutiny derives from the Supreme Court's decision in *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980). There, a private party sought *Parker* immunity on the ground that it acted in accordance with state policy. To prevent a private party from "casting . . . a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement," *Midcal*, 445 U.S. at 106, the conduct must pass a rigorous two-part test. First, the state must enact a "clearly articulated and affirmatively expressed" policy permitting anticompetitive conduct; and second, the State must "actively supervise[]" that conduct. *Id.* at 105 (citation omitted). *Midcal* analysis applies where private actors seek to immunize their anticompetitive conduct under the *Parker* doctrine, *see, e.g.*, *id.* at 106, or where a state agency is deemed functionally private because it is controlled by active market participants, *Dental Exam'rs*, 135 S. Ct. at 1114.

Finally, the Supreme Court announced an intermediate standard of review in *Town of Hallie v. City of Eau Claire*, 471 U.S. 34 (1985). There, it determined that municipalities are exempt from *Midcal*'s second prong—active supervision—but must still comply with

11

the first prong—conformity with a clearly articulated state policy. *Id.* at 40. The Supreme Court observed that the municipality was an "arm of the State" entitled to a presumption that it "acts in the public interest," *id.* at 45, the municipality is politically accountable for its anticompetitive policies, *id.* at 45 n.9, and there is thus "little or no danger" that the municipality would become "involved in a *private* price-fixing arrangement," *id.* at 47. In dicta, the Supreme Court has suggested that "prototypical" state agencies may be subjected to the same degree of scrutiny as a municipality. *See id.* at 46 n.10 ("In cases in which the actor is a state agency, it is likely that active state supervision [*Midcal*'s second prong] would also not be required, although we do not here decide that issue."); *Dental Exam'rs*, 135 S. Ct. at 1114 ("[T]he municipality [in *Hallie*] was more like prototypical state agencies, not specialized boards dominated by active market participants.").

In sum, the Supreme Court has established the following principles: *ipso facto* immunity applies to state legislatures and state supreme courts, but not to entities that are state agencies for limited purposes; *Midcal* scrutiny applies to private parties and state agencies controlled by active market participants; and *Hallie* scrutiny applies to municipalities, and perhaps state agencies. Applying those principles to the facts alleged in the Amended Complaint resolves this appeal.

12

IV


Because the level of scrutiny for state-action immunity turns on the character of the relevant actor, the first step of any *Parker* analysis is to identify the actor that performed the alleged anticompetitive conduct. We conclude that plaintiffs' alleged antitrust injury stems entirely from the conduct of the University, and we focus our analysis accordingly.


When beginning a *Parker* analysis that involves a private defendant, it is critically important to determine whether the private defendant caused the alleged antitrust injury.[4] *Bedell*, 263 F.3d at 258. In some cases, private defendants independently engage in anticompetitive conduct, such as price fixing, and then seek immunity under the "gauzy cloak of state involvement." *Midcal*, 445 U.S. at 106. In such a scenario, full *Midcal* scrutiny is required. *Id.* But in other cases, *Midcal* scrutiny may not be necessary because the private defendant does not act on its own and is merely an adjunct to a government's anticompetitive action. If a governmental actor is

---

[4] Antitrust injury means "(1) injury of the type the antitrust laws were intended to prevent and (2) that flows from that which makes defendants' acts unlawful." *Bedell*, 263 F.3d at 247 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1997)).

independently responsible for causing the alleged antitrust injury, "once [it] is determined to be immune . . . , the immunity should be extended to include private parties acting under [its] direction." *Zimomra v. Alamo Rent-A-Car, Inc.*, 111 F.3d 1495, 1500 (10th Cir. 1997). "Otherwise, plaintiffs could sue only the private parties and by winning antitrust judgments against them, could thwart state policies as if there were no state [i]mmunity." *Bedell*, 263 F.3d at 256 n.35; *see also S. Motor Carriers Rate Conference, Inc. v. United States*, 471 U.S. 48, 56–57 (1985). In *Massachusetts School of Law at Andover, Inc. v. American Bar Association*, for example, this Court found that a private entity was shielded behind the *ipso facto* immunity of the state (without need for *Midcal* scrutiny) because the alleged antitrust injury was caused solely by direct sovereign action. 107 F.3d 1026, 1036 (3d Cir. 1997).

In this case, plaintiffs allege that the public University and the private Foundation conspired to monopolize the student-housing market. But the only alleged actions of the Foundation—amending its charter, issuing bonds, building the dormitories, and managing the property—are consistent with participation in a competitive market. The Foundation's advantage derived entirely from the *University's* decision to expand its on-campus residency rule, which required more students to live in dormitories like the Highlands. Plaintiffs have not

14

identified any independent conduct of the Foundation that conceivably restricted competition. *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990) ("[I]njury . . . will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny . . . .").

Nor is this a case of "hybrid" anticompetitive conduct. *See Bedell*, 263 F.3d at 258.[5] *Bedell* involved a Multistate Settlement Agreement brokered between the governments of several states and certain tobacco manufacturers. The plaintiffs alleged that the Agreement established a cartel whereby private tobacco companies would be permitted to restrict output. This Court observed that the alleged anticompetitive conduct was neither "purely private" nor "entirely attributable to the

---

[5] *Bedell*'s discussion of *Parker* is arguably dicta because it resolved the appeal based on a different doctrine, and then went on to conclude that *Parker* immunity would *not* have resolved the appeal. 263 F.3d at 254. A subsequent decision of this Court, *Mariana v. Fisher*, noted as much, but concluded that *Bedell* is binding. 338 F.3d 189, 201–04 (3d Cir. 2003). That section of *Mariana*, however, was *also* arguably dicta for the same reason. Regardless, we are persuaded by *Mariana*'s embrace of *Bedell* as binding circuit precedent.

15

state." *Id.* Rather, the alleged antitrust injury derived from a "hybrid restraint," which "involve[d] a degree of private action which calls for *Midcal* analysis." *Id.* (citing *Rice v. Norman Williams Co.*, 458 U.S. 654, 666–67 (1982) (Stevens, J., concurring)). But in this case, there is no comparable "degree of private action," such as participation in a cartel, "which calls for *Midcal* analysis." *Id.*

We conclude that the Foundation was merely "acting under the direction of" the University. *Zimomra*, 111 F.3d at 1500. Therefore, if the University is immune, the Foundation must be as well. *Motor Carriers*, 471 U.S. at 56–57; *Mass. Sch. of Law*, 107 F.3d at 1036. Given that understanding of the Foundation's role in the challenged conduct, we proceed to analyze how the state-action doctrine applies to the University.[6]

---

[6] Our analysis focuses on the University even though it was not named as a defendant in this case. Preliminarily, the University is a party in interest based on the official-capacity claim against its president. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985). But even if plaintiffs had only sued the Foundation, "the same test should apply to determine state action immunity regardless of who the named defendants are." *Zimomra*, 111 F.3d at 1500.

# V


The fundamental question we must decide is which tier of scrutiny applies to the University's conduct: no further review (if the University is *ipso facto* immune), *Midcal* review, or *Hallie* review. The District Court held that the University is *ipso facto* immune because it is an arm of the state. We disagree. Instead, we conclude that *Hallie* review is appropriate because the University is more analogous to a municipality than to a private market participant.

A

The District Court held that the University is *ipso facto* immune because the University is an arm of the state under the Eleventh Amendment. But those two immunity doctrines are not coextensive. Even if the University were an arm of the state, the University is not "sovereign" for purposes of *Parker*. Unlike the General Assembly or the Supreme Court of Pennsylvania, the University cannot legislate anticompetitive policies on behalf of the Commonwealth. Thus, the University's decision to expand its on-campus residency requirement is not entitled to *ipso facto* immunity.

1

Sovereign action for purposes of direct *Parker* immunity is "qualitatively different" from state action in more familiar contexts. *Bedell*, 263 F.3d at 254. While traditional state action can cover

inadvertent or unilateral acts of state officials not acting pursuant to state policy . . . the term "state action" in antitrust adjudication refers only to government policies that are articulated with sufficient clarity that it can

18

> be said that these are in fact the state's policies, and not simply happenstance, mistakes, or acts reflecting the discretion of individual officials.

*Id.* (quoting 1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 221 (Rev. ed. 1997)). Thus, conduct might be deemed nonsovereign for purposes of *Parker* immunity "even if sectors of state government are involved." *Id.*; *see Dental Exam'rs*, 135 S. Ct. at 1113 (recognizing that nonsovereign entities can be "public or private"). In accordance with those principles, the Supreme Court has recognized *ipso facto* immunity in two limited contexts: state legislation and the decisions of state supreme courts, acting legislatively. *Hoover*, 466 U.S. at 568. The Court reserved the question of whether "the Governor of a State" is *ipso facto* immune, *id.* at 568 n.17, but as described below, has consistently required heightened scrutiny for subordinate branches of state government.

Recently in *North Carolina State Board of Dental Examiners v. FTC*, the Supreme Court addressed the status of an "agency of the state" with the authority to regulate the practice of dentistry in North Carolina. 135 S. Ct. at 1107. The dissenting Justices would have found *ipso facto* immunity, providing a simple resolution. *See id.* at 1117–18 (Alito, J., dissenting) ("Under *Parker,* the

19

Sherman Act . . . do[es] not apply to state agencies; the North Carolina Board of Dental Examiners is a state agency; and that is the end of the matter.").

But instead, the Court treated the regulatory board as a nonsovereign actor. It began with the familiar principle that "[s]tate legislation" and "decision[s] of a state supreme court, acting legislatively" are entitled to *ipso facto* immunity because "they are an undoubted exercise of state sovereign authority." *Id.* at 1110 (majority opinion). But the Court declined to apply *ipso facto* immunity to the agency:

> For purposes of *Parker*, a nonsovereign actor is one whose conduct does not automatically qualify as that of the sovereign State itself. State agencies are not simply by their governmental character sovereign actors for purposes of state-action immunity. Immunity for state agencies, therefore, requires more than a mere facade of state involvement . . . .

*Id.* at 1111 (citations omitted).

The Supreme Court's treatment of state agencies in *Dental Examiners* continues a long line of similar

20

precedents. As we noted above, the Court found that a state bar—a "state agency by law"—did not receive *ipso facto* immunity. *Goldfarb*, 421 U.S. at 789–91. "The fact that the State Bar is a state agency for some limited purposes does not create an antitrust shield that allows it to foster anticompetitive practices for the benefit of its members." *Id.*;[7] *see also, e.g.*, *Motor Carriers*, 471 U.S. at 57 ("The circumstances in which *Parker* immunity is available to . . . state agencies or officials regulating the conduct of private parties[] are defined most specifically by our decision in [*Midcal*]."); *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 410 (1978) (plurality opinion) ("[F]or purposes of the *Parker* doctrine, not every act of a state agency is that of the State as sovereign."); *cf. Hallie*, 471 U.S. at 46 n.10.

---

[7] Contrast *Goldfarb* with the Supreme Court's subsequent decision in *Bates v. State Bar of Arizona*, 433 U.S. 350 (1977). There, the Supreme Court found a state bar immune under *Parker*, but only after conducting what would later come to be known as *Midcal* analysis: the challenged restraint of trade was the "affirmative command of the Arizona Supreme Court," *id.* at 359, and was "subject to pointed re-examination" by that court, *id.* at 362; *see also Hoover*, 466 U.S. at 573 ("[T]he court itself approved the particular grading formula and retained the sole authority to determine who should be admitted to the practice of law in Arizona.").

21

2

Applying those principles, we conclude that the University is not entitled to *ipso facto* immunity. The University is not a sovereign decisionmaker analogous to a state legislature or state supreme court.

When the University amended its policy mandating a longer term of on-campus residency, it was not exercising sovereign powers. Rather, it was exercising discretion delegated by the Pennsylvania legislature, akin to acting as a state agency. *See Hoover*, 466 U.S. at 568 ("Closer analysis is required when the activity at issue is not directly that of the legislature or supreme court, but is carried out by others pursuant to state authorization."); *cf. Mass. Sch. of Law*, 107 F.3d at 1036 (applying *ipso facto* immunity because "this case does not involve a delegation of state authority"). As such, the University's conduct did not represent the sovereign's will "simply by [its] governmental character." *Dental Exam'rs*, 135 S. Ct. at 1111. It follows, *a fortiori*, that the University fits the definition of a "nonsovereign actor" for purposes of *Parker*: "one

whose conduct does not automatically qualify as that of the sovereign State itself." *Id.*[8]

The University, in fact, presents an easier case than prototypical state agencies. At most, the University is comparable to "a state agency *for some limited purposes*." *Goldfarb*, 421 U.S. at 791 (emphasis added). Unlike prototypical state agencies, the University's authority is limited to managing its own affairs and the affairs of its students, who voluntarily attend. It does not wield regulatory power. Thus, by comparison to other divisions of state government that might present closer

---

[8] Defendants argue that *Dental Examiners* is limited to its factual context—where a regulatory entity is controlled by private market participants. But that control was not relevant to the Court's holding that the Board was nonsovereign. *See Dental Exam'rs*, 135 S. Ct. at 1110–11. That antecedent question was resolved simply by the Board's status as an agency, as conceded by counsel for the Board. *Id.*; *see* Brief for Petitioner at 24–25, *Dental Exam'rs*, 135 S. Ct. 1101 (No. 13-534), 2014 WL 2212529. Rather, the control by market participants was relevant to the next step of the analysis—determining whether the Board's actions, as a nonsovereign, are required to meet both *Midcal* prongs or only one. *See Dental Exam'rs*, 135 S. Ct. at 1113–14.

23

cases, the University is clearly not sovereign for purposes of *Parker* immunity.[9]

Because the University is not a sovereign actor analogous to a state legislature or state supreme court, its pronouncements are not entitled to *ipso facto* immunity. Defendants are "[p]lainly . . . in error in arguing that *Parker* held that all governmental entities, whether state agencies or subdivisions of a State, are, simply by reason of their status as such, exempt from the antitrust laws." *Lafayette*, 435 U.S. at 408.

---

[9] The District Court's reasoning equates the phrase "traditional sovereign powers," *Bedell*, 263 F.3d at 258, with the phrase "traditional area of state power," *Edinboro*, 2016 WL 6883295, at *3. While providing for higher education is certainly a traditional state *function*, it does not follow that the University wields traditional sovereign *power*. Likewise, in *Dental Examiners*, professional licensing and regulation is a traditional area of state power. Yet that was no obstacle to the Supreme Court concluding that the Board was a nonsovereign actor. *Cf. Dental Exam'rs*, 135 S. Ct. at 1119 (Alito, J., dissenting) ("[T]he regulation of the practice of medicine and dentistry was regarded as falling squarely within the States' sovereign police power.").

Defendants argue that several of our sister circuits have recognized broad *ipso facto* immunity for the states' executive branches. Those cases are distinguishable.

In *Neo Gen Screening, Inc. v. New England Newborn Screening Program*, 187 F.3d 24 (1st Cir. 1999), the First Circuit conferred *ipso facto Parker* immunity on the Massachusetts Department of Public Health. In doing so, the Court recognized that "the status of state boards or commissions is open to dispute," and thus limited its holding to situations "where a full-fledged department is concerned." *Id.* at 29. Likewise, in *Deak-Perera Hawaii, Inc. v. Department of Transportation*, 745 F.2d 1281, 1283 (9th Cir. 1984), and subsequently *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869, 875 (9th Cir. 1987), the Ninth Circuit found *ipso facto* immunity for the actions of Hawaii's Department of Transportation.

Because we hold that the University is analogous to a "state agency for some limited purposes," *Goldfarb*, 421 U.S. at 791, rather than a "full-fledged department," *Neo Gen*, 187 F.3d at 29, our decision does not conflict with those rulings. We continue to reserve the question addressed by those courts—whether *ipso facto* immunity

applies to prototypical state agencies or high-ranking executive officials acting within their lawfully delegated authority. *Cf. Bedell*, 263 F.3d at 256 ("We have yet to address whether the acts of executive officials constitute state action that avoids *Midcal* analysis.").

Finally, defendants rely on *Saenz v. University Interscholastic League*, 487 F.2d 1026 (5th Cir. 1973). There, the Fifth Circuit found *Parker* immunity because the defendant was "an integral part of the University of Texas at Austin," and therefore "constitute[d] a governmental entity outside the ambit of the Sherman Act." *Id.* at 1028. But *Saenz* predates every development to the *Parker* doctrine we have discussed in this decision. Not only does it predate *Midcal* and *Hallie*, but also it predates *Goldfarb*, the first case where the Supreme Court held that a state agency is not *ipso facto* immune. Simply put, the analysis we are required to apply did not exist at the time *Saenz* was decided. Accordingly, we join those courts that have applied modern state-action principles to deny *ipso facto* immunity to public universities. *See, e.g.*, *Auraria Student Hous. at the Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1250 (10th Cir. 2016); *Porter Testing Lab. v. Bd. of Regents for Okla. Agric. & Mech. Colls.*, 993 F.2d 768, 772 (10th Cir. 1993); *Seaman v. Duke Univ.*, No. 1:15-cv-462, 2016 WL 1043473, at *1 (M.D.N.C. Feb. 12, 2016); *Humana of Ill., Inc. v. Bd. of Trustees of S. Ill.*

*Univ.*, No. 84-2373, 1986 WL 962, at \*5 (C.D. Ill. June 3, 1986); *Am. Nat'l Bank & Trust Co. of Chi. v. Bd. of Regents for Regency Univs.*, 607 F. Supp. 845, 849–50 (N.D. Ill. 1984); *see also Daniel v. Am. Bd. of Emergency Med.*, 988 F. Supp. 127, 183 (W.D.N.Y. 1997) (university hospitals).

We conclude that the University's conduct does not constitute direct sovereign action under the *Parker* doctrine. While the University is a governmental entity, "[a]cting alone," it is not empowered with the sovereign authority to legislate the "policy of the State itself." *Motor Carriers*, 471 U.S. at 62–63.

B

Having concluded that *ipso facto* immunity is inappropriate, "closer analysis is required." *Hoover*, 466 U.S. at 568. Ordinarily that entails applying *Midcal*'s rigorous two-part test. But "there are instances in which an actor can be excused from *Midcal*'s active-supervision requirement." *Dental Exam'rs*, 135 S. Ct. at 1112. We conclude that this is such an instance because the University is more closely analogous to the municipality in *Hallie* than to a private market participant.

27

1

The University is exempt from *Midcal*'s active-supervision requirement in accordance with the Supreme Court's reasoning in *Hallie*.

In *Hallie*, the Court contrasted the incentives of municipalities and private parties. It observed that, because the municipality was "an arm of the State . . . [, w]e may presume, absent a showing to the contrary, that the municipality acts in the public interest. A private party, on the other hand, may be presumed to be acting primarily on its own behalf." *Hallie*, 471 U.S. at 45. The Court then reasoned:

> Where a private party is engaging in the anticompetitive activity, there is a real danger that he is acting to further his own interests, rather than the governmental interests of the State. Where the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement. The only real danger is that it will seek to further purely parochial public interests at the expense of more overriding state goals. This danger is minimal, however, because of the requirement that the municipality act

> pursuant to a clearly articulated state policy. Once it is clear that state authorization exists, there is no need to require the State to supervise actively the municipality's execution of what is a properly delegated function.

*Id.* at 47.

We conclude that this reasoning applies squarely to the University. Like the municipality in *Hallie*, the University is not a sovereign actor, but is still an "arm of the State" presumed to "act[] in the public interest." *Id.* at 45. Unlike a private business, the University's self-interest is more closely aligned with certain "governmental interests of the State." *Id.* By advancing the project of higher education—a project blessed by the Pennsylvania legislature as a valuable public function—the University is primarily at risk that "it will seek to further purely parochial public interests at the expense of more overriding state goals." *Id.*

Therefore, meeting *Midcal*'s first requirement—acting "pursuant to a clearly articulated state policy"—is sufficient to ensure that a PASSHE university is executing its "properly delegated function." *Id.* We thus join with the Tenth Circuit, which similarly held that, for

29

"a state created and funded university, . . . a showing of active supervision is unnecessary to qualify for state action antitrust immunity." *Porter*, 993 F.2d at 772; *see also Auraria*, 843 F.3d at 1250; *Humana*, 1986 WL 962, at \*5; *Am. Nat. Bank & Tr.*, 607 F. Supp. at 849–50.

2

The only Supreme Court decision explicitly requiring full *Midcal* scrutiny for the independent actions of a state agency, *Dental Examiners*, is distinguishable.

In *Dental Examiners*, the North Carolina Board of Dental Examiners sought a similar exemption from the active-supervision requirement in light of its status as a state agency. But the Court held that "the need for supervision turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade." 135 S. Ct. at 1114. Because the Board was "controlled by active market participants, who possess singularly strong private interests," the Court treated the Board as "similar to [a] private trade association," necessitating full *Midcal* scrutiny. *Id.*

30

The analogous situation in this case would be if the Foundation—a private, active participant in the real estate market—dominated and controlled the University. In such a case, there would be a risk of self-dealing; the active market participant would be empowered "to decide who can participate in its market, and on what terms," rendering "the need for supervision . . . manifest." *Id.* For *Dental Examiners* to apply, plaintiffs would be required to identify a "structural risk" that "a controlling number of decisionmakers" at the University "are active market participants." *Id.*

Plaintiffs did not plead any facts that plausibly give rise to such an inference. We thus conclude that *Dental Examiners* does not mandate full *Midcal* scrutiny for the University. But as we describe below, the complaint may be amended to include such facts if they exist. *See infra* Section VI.B.

* * *

We conclude that *Hallie* scrutiny is appropriate for PASSHE universities. Absent any special circumstances that necessitate full *Midcal* review, PASSHE universities, like municipalities, can be presumed to act in the public interest. Ordinarily, therefore, they need only comply

31

with *Midcal*'s first prong—conformity with a clearly articulated state policy.

VI

We now apply the *Hallie* test to the University and to the Foundation. We conclude that the University's conduct is immune under that standard, and that the University's immunity passes through to the Foundation. We will therefore affirm in part on those alternative grounds.[10] *See, e.g.*, *Oss Nokalva, Inc. v. European Space Agency*, 617 F.3d 756, 761 (3d Cir. 2010) ("[W]e may affirm a judgment on any ground apparent from the record, even if the district court did not reach it." (internal quotation marks and citation omitted)). But because further amendment may not be futile, we will remand with instructions to dismiss the Amended Complaint without prejudice.

---

[10] We need not, therefore, address defendants' argument that we should affirm on the alternative ground of *Noerr-Pennington* immunity.

A

The University's conduct complies with a clearly articulated state policy because mandating on-campus residency is a foreseeable consequence of the legislative mandate to provide appropriate student living facilities.

Because "[n]o legislature . . . can be expected to catalog all of the anticipated effects of a statute delegating authority to a substate governmental entity," the Supreme Court has "approached the clear-articulation inquiry more practically." *F.T.C. v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003, 1012 (2013) (quoting *Hallie*, 471 U.S. at 43). The clear-articulation test is met if an anticompetitive effect is the "foreseeable result" of the state's authorization. *Hallie*, 471 U.S. at 42; *see Lafayette*, 435 U.S. at 415 (a political subdivision need not "point to a specific, detailed legislative authorization").

Where a state delegates generic contracting powers, the clear-articulation test is not met. *See Phoebe Putney*, 133 S. Ct. at 1012 (holding that "general corporate power" to enter into acquisitions does not clearly authorize anticompetitive consolidation of hospital ownership); *Cmty. Commc'ns Co.*, 455 U.S. at 55–56 (holding that a "neutral" grant of power to enact

municipal ordinances does not "impl[y] state authorization to enact specific anticompetitive ordinances"). But clear articulation may be established where "displacement of competition was the inherent, logical, or ordinary result" of the authority delegated by the state legislature, such that the state "must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Phoebe Putney*, 133 S. Ct. at 1013; *see, e.g.*, *Hallie*, 471 U.S. at 41 (the power of a city to exclude surrounding unincorporated areas from the provision of sewage related services affirmatively contemplates anticompetitive effects); *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 373 (1991) (a state statute authorizing municipalities to adopt zoning ordinances foreseeably resulted in the suppression of competition in the billboard market).

In this case, the Pennsylvania General Assembly enacted the policy that "[e]ach institution shall provide appropriate . . . student living facilities." 24 P.S. § 20-2003-A(a). That mandate does more than confer "general corporate powers," *Phoebe Putney*, 133 S. Ct. at 1011, although the University certainly has such powers as well, *see, e.g.*, 24 P.S. § 20-2003-A(b).

The intention to displace competition is evident when the mandate is read in light of common practice

and the University's educational mission. *See* Pa. Const. art. III, § 14; 24 P.S. § 20-2003-A(a). As even plaintiffs acknowledge, rules requiring on-campus residency are "common at many colleges and universities," and are justified, at least in part, by the educational benefits of a "living and learning" environment and "the doctrine of *in loco parentis*" (or "the school's attempts to fulfill a 'parental' role"). Am. Compl. ¶¶ 41–43. It is eminently "ordinary" and "foreseeable" that universities would consider those benefits and adopt rules requiring some term of on-campus residency in fulfilling their mandate to provide "appropriate . . . student living facilities." 24 P.S. § 20-2003-A(a); *cf. Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 85 (2d Cir. 2000) (noting that on-campus residency requirements exist at "many colleges and universities across the country," and affect "millions of students who have attended those institutions in the more than a century since the Sherman Act was enacted"); *Porter*, 993 F.2d at 771 (finding clear articulation because a statute delegated a "specific" function to "a nonprofit state institution," a public university).

It is clear that the General Assembly "must have foreseen and implicitly endorsed" such policies. *Phoebe Putney*, 133 S. Ct. at 1013. In fact, according to plaintiffs, the University's on-campus residency rule was first enacted in 1989. Am. Compl. ¶ 43. We see no reason

35

why the expansion of that requirement from two semesters to four would exceed what the General Assembly might have reasonably foreseen.[11]

After this case was argued, the Tenth Circuit decided a similar case, *Auraria Student Housing at the Regency, LLC v. Campus Village Apartments, LLC*, 843

---

[11] Plaintiffs aver that the University expanded its rule "purely for financial reasons, specifically to ensure occupancy levels in on-campus 'affiliated' housing generate sufficient revenue to service the $100-plus million bond debt incurred by the Foundation to develop the Highlands Project." Am. Compl. ¶ 46. These allegations do not alter our analysis. The Supreme Court has "consistently sought to avoid" any "deconstruction" or "probing of the official 'intent.'" *Omni*, 499 U.S. at 377.

Nor are we influenced by plaintiffs' allegation that the University acted *ultra vires* by failing to engage in a competitive bidding process, 24 P.S. § 20-2003-A.1(c.2), or by failing to fulfill its mandate "to provide high quality education at the lowest possible cost for students," *id.* § 20-2003-A(a). *Parker* analysis does not "dictate[] transformation of state administrative review into a federal antitrust job." *Omni*, 499 U.S. at 372 (quoting 1 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 212.3b, at 145 (Supp. 1989)).

F.3d 1225 (10th Cir. 2016). The Tenth Circuit applied the *Hallie* test and concluded that the Colorado legislature did not clearly express an intent to displace competition in the student-housing market. *Id.* at 1250–51. But the Tenth Circuit did not cite, nor did it distinguish, any part of Colorado law that grants educational institutions discretion in providing student housing that they deem appropriate in light of their educational missions. Rather, the Court concluded that Colorado law merely grants "permission to enter into agreements" and other generic powers "that are common in the marketplace." *Id.* at 1251. From that premise, the Court was bound to follow *Phoebe Putney*, 133 S. Ct. at 1012, and *Community Communications Co.*, 455 U.S. at 55–56, to conclude that there was no clear articulation. But we interpret the Pennsylvania statute as conferring more than mere contracting powers; we read a clearly articulated intention to displace competition in student housing. We therefore conclude that *Auraria*'s application of the *Hallie* test is distinguishable.[12]

---

[12] Finally, plaintiffs argue that we should recognize a so-called market-participant exception to *Parker* immunity. The Supreme Court, as well as this Court, have discussed such an exception in dicta. *See Phoebe Putney*, 133 S. Ct. at 1011 n.4; *Omni*, 499 U.S. at 379; *Bedell*, 263 F.3d at 265 n.55. The existence of such an

37

Accordingly, we conclude that the University's conduct conformed to a clearly articulated state policy, and therefore constituted immune state action under *Hallie*. Because plaintiffs' alleged antitrust injury derives

exception is not clearly established. *See, e.g.*, *VIBO Corp. v. Conway*, 669 F.3d 675, 686–87 (6th Cir. 2012); *Hedgecock v. Blackwell Land Co.*, 52 F.3d 333, 1995 WL 161649 (9th Cir. 1995) (table opinion); *Genentech, Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 949 (Fed. Cir. 1993) *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995); *Paragould Cablevision, Inc. v. City of Paragould*, 930 F.2d 1310, 1313 (8th Cir. 1991) ("[T]he market participant exception is merely a suggestion and is not a rule of law.").

We need not resolve this issue here. And even assuming that such an exception exists, it would not apply to this case. A market-participant exception would only apply where "[t]he government entity . . . was involved in the market as a buyer or seller." *Bedell*, 263 F.3d at 265 n.55 (citing *Union Pac. R.R. Co. v. United States*, 313 U.S. 450 (1941)). While the University leased certain property to the Foundation, the Complaint only alleges that the *Foundation's* transactions in the student-housing market are part of an anticompetitive scheme. Applying a market-participant exception to these circumstances would swallow the rule that "the state does not forfeit *Parker* immunity simply because it acts with a private party." *Id.*

solely from the University's conduct, we further conclude that the University's immunity also shields the Foundation. *See supra* Section IV.

B

Plaintiffs have not pled that members of the Foundation constituted a "controlling number of decisionmakers" within the University. *Dental Exam'rs*, 135 S. Ct. at 1114. It could be the case, for example, that members of the Foundation's board of directors constituted a majority of the University's Council of Trustees. If such facts exist, *Midcal*'s active-supervision requirement could be applicable. *Id.* Given that possibility, amendment may not be futile and we will remand with instructions that the Amended Complaint be dismissed without prejudice to plaintiffs' right to file a second amended complaint. *See, e.g.*, *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 861 (3d Cir. 2014).

VII

We will affirm in part on the alternative grounds set forth above and reverse and remand with instructions

that the Amended Complaint be dismissed without prejudice.